**HOUSEHOLD CREDIT SERVICES, INC., Appellant,**

v.

**Albert DRISCOL and Marianne Driscol, Appellees.**

No. 08–96–00209–CV.

Court of Appeals of Texas, El Paso.

Dec. 30, 1998.

---

Robert A. Skipworth, Ainsa, Skipworth, Martinez & Driscoll, L.L.P., El Paso, Glen M. Boudreaux, David Scott Curcio, Kirklin, Boudreaux, & Leonard, Houston, for Appellant.

Ivy Gage, Gage, Gage & Kern, El Paso, Eugene A. Cook, Gael Catherine Mary Plauche, Bracewell & Patterson, L.L.P., Houston, for for Appellees.

Before BARAJAS, C.J., LARSEN, and CHEW, JJ.

## *OPINION*

RICHARD BARAJAS, Chief Justice.

This is an appeal from a jury verdict in favor of plaintiff/Appellees Albert and Mar-

ianne Driscol in the amount of approximately $11.7 million against Allied Adjustment Bureau and defendant/Appellant Household Credit Services, Inc. The Driscols' lawsuit was based on the defendants' attempts to collect an undisputed debt owed by Marianne Driscol. Although Allied did not appear at trial and is now defunct, the jury awarded both compensatory and exemplary damages against both defendants. We affirm in part, modify in part, and reverse and render in part.

## SUMMARY OF THE EVIDENCE

Appellee Marianne Driscol had a VISA card account with Appellant, Household Credit. After losing her job in Massachusetts, Ms. Driscol and her husband, Appellee Albert Driscol, moved to El Paso. Though Ms. Driscol found a job at People Lease, Inc. in El Paso, Mr. Driscol did not find work and money remained tight. Ms. Driscol began to fall behind on the payments on her approximately $2,700 VISA card balance. In about May 1991, Household's internal collections personnel started placing telephone calls to Ms. Driscol in an effort to collect on the account. The parties disagree sharply on the nature, quantity, and timing of Household's collection calls that continued until January 28, 1992, when Household turned Ms. Driscol's account over to Allied Adjustment Bureau, a collection agency, for further collection efforts.

Ms. Driscol testified that Household began calling her at work and home. Despite several telephone conversations and one certified letter requesting that Household stop calling her workplace, the calls to Ms. Driscol at People Lease continued. Calls to the Driscol home came in at a rate of four or five times per day, sometimes at 6:30 on weekend mornings and after 11 on weekday evenings. These odd-hour calls also continued despite Ms. Driscol's requests that they stop. The language Household used during the calls was "horrible," "disrespectful," and "nasty." When Ms. Driscol attempted to explain that her husband was out of work but she intended to pay what she could, Household personnel told her that "they didn't want to hear any sob stories, they'd heard it all." They

also told her to "just pay [her] goddamn bill." There was "a lot of swearing and a lot of that four-letter word—'F-' . . . a lot of abusive language on the telephone." On at least one occasion, a Household collector called Ms. Driscol a "bitch." Again, despite her requests to stop the abusive language, it continued.

Ms. Driscol's husband, Albert, testified that he often took the calls from Household because the calls upset Ms. Driscol too much. Household's collectors were "real nasty and vulgar" on the phone. One Household collector told him that Ms. Driscol had better call Household back or "her ass was in big trouble." Mr. Driscol called Household several times to complain and attempted to speak to a supervisor about the abusive language and odd-hour calls, but the supervisor was not available at the time he had been given to contact her.

On the other hand, witnesses on behalf of Household testified that Household demands courtesy of its collectors, that profanity toward and harassment of debtors is forbidden, that actual telephone contact with debtors is allowed only twice in any seven-day period and only once on any one day, and that calls to debtors are allowed only between the hours of 8 a.m. and 9 p.m. To ensure that no debtor was called more often than allowed, each collector worked from a computerized "collection queue" designed to keep calls to debtors within Household's stated frequency policy. The computer system also made sure that collectors did not call debtors too early in the morning, or too late at night by placing debtors in the queue only when it was between the hours of 8 a.m. and 9 p.m. in the debtor's time zone.

John Matusiak, Household's director of recovery, testified that if a debtor asked not to be called at work, Household would place a note in the debtor's file and replace the debtor's work phone number with all 9s. Matusiak maintained that Household followed its procedures with Ms. Driscol's account, including blocking her work phone number after she made a written request that Household stop calling her at her place of employment. Moreover, Matusiak denied that Household received any complaints from

Ms. Driscol, other than the single written request to cease calls to her workplace, until it was served with her lawsuit.

Marissa Castillon, a Household collector assigned to Ms. Driscol's account, denied that she ever used derogatory names, profanity, or vulgar language when talking to Ms. Driscol or any other debtor. Rather, she maintained that she always treated debtors just as she would want to be treated. Specifically, Castillon contended that she treated Ms. Driscol with sympathy when Ms. Driscol told Castillon that she could not pay her account because Mr. Driscol was out of work. Castillon's last contact, which was also Household's last contact with Ms. Driscol, was on November 18, 1991, when Castillon informed Ms. Driscol that Household would have to refer her account to a collection agency. Castillon admitted, however, that it was possible that other Household collectors contacted Ms. Driscol before Household turned the account over to Allied on January 28, 1992.

The Driscols testified that the abusive conduct not only continued, but got worse when Allied began attempts to collect on the VISA account. Mr. Driscol recounted that an Allied collector, who used the name Carol Lamb,[1] made most of the contact with the Driscols on behalf of Allied. Lamb would scream and cuss at the Driscols, getting "totally out of control" on the phone. Mr. Driscol described Lamb as "unbelievable ... plumb crazy ... like a wild woman ... vulgar, very vulgar." Lamb once told Mr. Driscol that he had "better do what the fI tell you." She threatened to "make Marianne's life miserable in El Paso" and to "blackball" Ms. Driscol so that "she'd never work again."

Ms. Driscol testified that Ms. Lamb made good on the threats by calling her incessantly at work. Ms. Driscol asked Lamb to stop calling her at work, and told Lamb that she had written to Household regarding calls to her workplace, but Lamb continued to call. Ms. Driscol's supervisor, Patricia Kiddney, began to take Lamb's calls. She likewise asked Lamb to stop calling People Lease, but Lamb's calls did not cease. At times, the calls were so numerous that all of People Lease's phone lines were tied up with calls

from Lamb. In a single two-hour time period on February 13, 1992, Lamb placed 26 calls to People Lease.

Ms. Driscol claimed that she called customer service at Household to complain about the calls from Allied. Although Household told Ms. Driscol that they would look into and stop the problem, Household did nothing. Eventually, the calls became so disruptive to People Lease's business that Gary Thompson, president of People Lease, called Household to complain. After Thompson's call, Henry Mauriss, president of Allied, called Thompson to apologize and assure Thompson that the harassing phone calls would not continue. Shortly thereafter, a woman called People Lease and stated, "You'd better evacuate, there's a bomb." The woman did not identify herself of course, but Cynthia Lozano, People Lease's receptionist, testified that she recognized the voice as that of Lamb. Lozano called the police, and Thompson reported the bomb threat as well as the previous harassing phone calls to the FBI.

Even more disturbing, Ms. Driscol testified that the day before the bomb threat, Rick Lewis, who identified himself as Lamb's supervisor, called and calmly told her, "I just wanted to let you know that I put a contract out on you ... you better be careful leaving your house and coming home, because we're going to get you." Richard Gabbert, who had used the pseudonyms "Rick Lewis" or "Rich Lewis" as a collector for Allied, also testified at trial. He denied threatening Ms. Driscol, and testified that Allied observed rules similar to those of Household regarding contact with debtors. According to Henry Mauriss, whose deposition testimony was read to the jury, Allied had never received complaints about either Lewis or Lamb before the Driscols made their allegations.

Ms. Driscol resigned from People Lease shortly after the bomb threat because she felt that her work environment had deteriorated after all of Household's and Allied's collection attempts. She did not look for another job because she was "scared to death" to leave her house after the threats

---

1. Allied's collectors used pseudonyms when contacting debtors.

she had received. Not long after she resigned from People Lease, Ms. Driscol was almost attacked by a man in a grocery store parking lot. She admitted at trial that the incident could have been a coincidence, but she maintained that at the time of the attack, she believed Rick Lewis might have sent the man to "get" her. The phone harassment, threats, and finally the perceived attack so frightened Ms. Driscol that she and her husband moved from El Paso to Truth or Consequences, New Mexico. Ms. Driscol believed that Household and Allied would not look for her there because most of the town were retired people. Soon after relocating to Truth or Consequences, Ms. Driscol found a job at a local bank, where she started as a teller, and later became a customer service representative.

The Driscols filed suit against Household and Allied on June 17, 1992. They alleged multiple causes of action against both defendants including unreasonable debt collection, negligence, gross negligence, intentional infliction of emotional distress, invasion of privacy, and violations of the Fair Debt Collection Practices Act. Additionally, the Driscols charged Household with a cause of action for the use of an independent debt collector after obtaining knowledge that the collector was in violation of the Fair Debt Collection Practices Act. Trial was to a jury which found in favor of the Driscols on each of their causes of action against both defendants and returned a verdict, including exemplary damages, of $11,697,058.35 less the $2,875 in principal and interest Ms. Driscol still owed on her VISA card. Household appeals with thirty-three points of error.[2]

## ONE SATISFACTION RULE

■ In its first point of error, Household contends that the trial court impermissibly multiplied the Driscols' recovery by entering judgment for separate damages on each cause of action when the conduct supporting each cause of action resulted in the same injuries. Pursuant to Rule 48 of the Texas Rules of Civil Procedure, a party may plead "as many separate claims or defenses as he has regardless of consistency." TEX.R.

CIV. P. 48. The "one satisfaction rule," however, provides that a plaintiff cannot obtain more than one recovery for the same injury. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex.1991). If a plaintiff pleads alternate theories of liability under Rule 48, a judgment that awards damages based upon more than one theory does not amount to a double recovery if the theories of liability arise from two separate and distinct injuries, and there has been a separate and distinct finding of damages on both theories of liability. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987); *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 528 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.). On the other hand, where there is only one injury; where the theories of liability are mutually exclusive; or where there are no separate damage findings based on the alternate theories of liability; there can be but one recovery. *See Southern County Mut. Ins. v. First Bank & Trust*, 750 S.W.2d 170, 173–74 (Tex.1988); *Borden*, 860 S.W.2d at 528–29. Moreover, the one satisfaction rule limits a plaintiff's recovery to one of several overlapping theories, notwithstanding that elements required under the separate theories of action vary somewhat, and notwithstanding that the amounts awarded vary from claim to claim. *Berry Property Management, Inc. v. Bliskey*, 850 S.W.2d 644, 666 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.); *International Piping Systems v. M.M. White & Assoc.*, 831 S.W.2d 444, 452 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

■ In this case, the Driscols submitted identical damages questions after each liability question. The jury was asked to measure the damages for each cause of action in terms of past and future lost earning capacity, past and future mental anguish, future medical expenses, and past and future physical pain and suffering. Moreover, the evidence supporting each cause of action is the same. In partial recognition of their verdict's one satisfaction rule problem, the Driscols elected after trial to abandon their causes of action for the alleged statutory violations and the use of an independent debt

2. Allied did not appear to defend at trial and does not appeal.

collector after gaining knowledge of the collector's statutory violations. They maintain, however, that their remaining causes of action are individually supported by separate acts of Allied and Household.

■ Although the Driscols suggest on appeal that the calls at work can be separated from the early morning and late night calls at home which can be further separated from the foul language used during the calls and that each of these actions gave rise to a separate cause of action and caused a discreet damage, that was not the manner in which they chose to present their evidence at trial. Rather, they alleged a deluge of inappropriately timed phone calls, both at home and work, full of foul language and threats. Neither Ms. Driscol nor her husband made any attempt to suggest in their testimony, as they do on appeal, that the phone calls to Ms. Driscol's work give rise to a cause of action for unreasonable debt collection[3] and caused shock, embarrassment, anguish, and humiliation, but somehow did not constitute negligence or an invasion of privacy and further did not cause difficulty concentrating at work, depression, anger, anxiety, or stress. Those results are assigned in the Driscols' brief to their cause of action for negligence, which they contend was precipitated only by the negligent hiring, supervision, and training of Allied and Household debt collectors. Yet, the Driscols do not argue any particular conduct of the collectors arising from the allegedly negligent supervision and training. The only conduct we are able to discern from the record is the same inappropriate calls and threats that the Driscols argue give rise to their other causes of action. Invasion of privacy, the Driscols contend, is supported by the continual calls to the Driscols' home and the exposure of Ms. Driscol's co-workers to the issues involved in the debt collection. We are hard pressed, however, to determine how, if not by the calls to Ms. Driscol's workplace (which she attempts to segregate into her unreasonable debt collection action) Ms. Driscol's co-workers were exposed to the debt collection. Under the facts as the Driscols presented them at trial, each of the Driscols' causes of action, although made up of separate proof elements, are based on the same facts and resulted in the same damages.

■ Additionally, the Driscols argue that, at the very least, their intentional infliction of emotional distress claim is separated from all other causes of action by the unconscionability of the conduct necessary to support it. The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993). Conduct is not extreme and outrageous for purposes of the tort of intentional infliction of emotional distress unless it is atrocious, beyond all possible bounds of decency, and utterly intolerable in a civilized community. *Id.* Extreme and outrageous conduct does not include mere insults, indignities, threats, annoyances, or petty oppression. *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 681 (Tex.App.—El Paso 1997, writ denied); *Horton v. Montgomery Ward & Co., Inc.*, 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied) (quoting RESTATEMENT (SECOND) OF TORTS § 46, Comment d (1965)).

According to the Driscols, the only acts extreme and outrageous enough to rise to the level of intentional infliction of emotional distress in this case are the bomb and death threats Allied made to Ms. Driscol. We do not wholly agree. Under the facts as the Driscols presented them at trial, the entire

---

**3.** The Driscols also assert that their action for unreasonable debt collection is differentiated from their negligence claims because it is an intentional tort. We agree that unreasonable debt collection is generally an intentional tort. *See Pullins v. Credit Exchange of Dallas*, 538 S.W.2d 681, 683 (Tex.Civ.App.—Waco 1976, writ ref'd n.r.e.). The Driscols, however, submitted the following definition of "unreasonable debt collection" for the jury: "'Unreasonable Debt Collection Efforts' means collection efforts which a person of ordinary prudence in the exercise of ordinary care on his part would not have exercised under the same or similar circumstances." Thus, the Driscols submitted their unreasonable debt collection cause of action as a form of negligence.

course of conduct in this case gives rise to the intentional infliction of emotional distress claims. With the possible exceptions of the bomb and death threats, no single action of Household or Allied alone, including name-calling, foul language, any single ill-timed phone call, multiple calls at home on any single day, repeated calls to Ms. Driscol's place of employment after she asked them to stop, or even the threat to make Ms. Driscol's life miserable, rises to the level of intentional infliction of emotional distress. But all of these acts taken together amount to such harassment of a woman who simply could not pay her VISA bill as to be more than petty oppression. Together, they rise to the level of behavior beyond all possible bounds of decency, and utterly intolerable in a civilized community. That the death and bomb threats were the worst components of the harassment and might, on their own, have satisfied the requirements for intentional infliction of emotional distress does not sufficiently divorce them from the other conduct to form a separate tort. The jury in the instant case was free to accept or disregard the Driscols' version of the facts. According to the Driscols, the conduct of Household, and later Allied, was an integrated barrage of harassment resulting in distress so severe that Ms. Driscol was afraid to answer her phone, go to the door, or leave her home even before the bomb and death threats.

■ Accordingly, we sustain Point of Error One and find that the Driscols may recover on only one of their theories of recovery. When, as in this case, the plaintiff establishes separate theories of liability based on the same facts, and fails to elect between more than one recovery, then the appellate court should render judgment on the finding affording the greatest recovery. *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex.1987); *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 938 (Tex.App.—Houston [14th Dist.] 1994, writ denied). In this case, the jury awarded the greatest recovery for the Driscols' unreasonable debt collection efforts cause of action. We find, however, that there is a defect in the way this cause of action was submitted to the jury, which brings us to Household's second point of error.

## MULTIPLE RECOVERY BASED ON CHARGE ERROR

Household contends in its second point of error that the judgment represents an impermissible multiple recovery because the following trial court instruction allowed the jury to consider the conduct of Allied when answering the questions pertaining to Household's liability and in awarding damages against Household:

> When a corporation is involved, of course, it may act only through natural persons as its agents or employees; and, in general, any agent or employee of a corporation may bind the corporation by his acts and declarations made while acting within the scope of his authority delegated to him by the corporation, or within the scope of his duties as an employee of the corporation.

Because the jury was also asked the same liability questions regarding Allied's conduct, and because Household was held liable for Allied's conduct on an agency theory, Household argues that it has paid twice for Allied's conduct. Moreover, Question One specifically incorporated agency into its language as follows:

> Did Household Credit Services, Inc. *through its agents or employees* engage in unreasonable debt collection efforts in an attempt to collect a debt from Plaintiff, Marianne Driscol? [Emphasis added.]

*1. The Instruction*

Household maintains that the trial court's instruction, specifically the portion that informed the jury that a corporation "may act only through natural persons as its agents or employees" instructed the jury to consider not only Household's employees' conduct, but also Household's agents' conduct in every liability and damages question pertaining to Household. Since the jury found Allied to be Household's agent, Household argues that the instruction caused the jury to consider Allied's conduct when it answered each liability and damages question. We disagree.

■ First, we note that the instruction is a correct statement of the law. A

corporation cannot act but through natural persons who are employees or agents of the corporation. *See Estate of Ellender*, No. 96–1299, 968 S.W.2d 917, 1998 WL 226454, at *3 (Tex.1998). Turning to an analysis of Household's complaint, we are mindful that the appellate court should review the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n.*, 710 S.W.2d 551, 555 (Tex.1986). Most importantly in this case, the instruction was stated in the disjunctive. The jury was told that a corporation could act through its agents *or* employees. Thus, the instruction correctly informed the jury that a corporation may act through two types of representatives: employees or agents. This, coupled with an instruction later in the charge explaining the legal definition of "agent" makes it adequately clear that an agent is a separate type of legal entity from an employee. Moreover, the remainder of the charge, except for Question One which we will address next, separated the conduct of Household from the conduct of Allied. There was a series of liability and damage questions pertaining to "Household Credit Services, Inc.," then a series of questions regarding Allied's status as agent or independent contractor, then last came a series of questions inquiring into Allied's conduct. Accordingly, we find that the instruction did not cause the jury to include the conduct of Allied in each question pertaining to Household's liability, and we overrule that portion of Point of Error Two challenging the instruction.

### 2. Question One

Question One, however, presents a different situation. That question specifically included agency within its language. The jury was asked if Household, through its agents or employees, engaged in unreasonable debt collection efforts. By including agents within the language of this question, the jury was specifically instructed to include Allied's conduct if indeed it found Allied to be Household's agent. Since the jury did later find Allied to be the agent of Household, it appears almost certain that the jury included

Allied's conduct in its response to this question. The damages question related to unreasonable debt collection also included the questioned agency language. We note that the jury's actual damage finding for the other damage issues relating to Household's conduct which did not include the agency language ranged from one-and-one-half to four times lower, with the majority closer to four times lower, than the damages awarded for unreasonable debt collection. Accordingly, we find that the trial court erred in its submission of Question One and that the error was reasonably calculated and probably did cause rendition of an improper judgment on the Driscols' unreasonable debt collection cause of action. TEX.R.APP. P. 44.1(a)(1). We therefore sustain the portion of Household's second point of error complaining of charge error in Question One.

### 3. Appropriate Remedy

Generally, harmful charge error would result in a reversal and remand to the trial court for new trial. Under the particular circumstances of this case, however, we find that we can fashion an appropriate and correct remedy without remand. Since we found that the Driscols' failure to elect a single remedy violated the one recovery rule in our consideration of Household's first point, we must render judgment on the finding affording the greatest recovery. *Birchfield*, 747 S.W.2d at 367; *Murphy*, 868 S.W.2d at 938. Because Question One afforded the greatest recovery, but a defect in its submission would result in a remand for new trial, we instead move to the finding on the cause of action affording the next greatest recovery. In this case, that finding is on the Driscols' invasion of privacy cause of action.[4] Accordingly, we sustain Household's first point of error and reform the judgment of the trial court to reflect recovery only on the Driscols' invasion of privacy cause of action.

### SUFFICIENCY OF THE EVIDENCE

In its ninth point of error,[5] Household contends that the evidence is le-

---

4. When exemplary damages are included.

5. In its eighth and tenth points, Household challenges the sufficiency of the evidence to support

gally and factually insufficient to support the jury findings that Household invaded the Driscols' privacy.[6] In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Texas Tech Univ. Health Sciences Ctr. v. Apodaca*, 876 S.W.2d 402, 411 (Tex.App.—El Paso 1994, writ denied). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 25 (Tex. App.—El Paso 1994, writ denied); *Hallmark v. Hand*, 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied). "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. *Neily v. Aaron*, 724 S.W.2d 908, 913 (Tex.App.—Fort Worth 1987, no writ). The test for factual insufficiency points is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact as well as evidence which tends to disprove its existence. It is for the jury to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). The jury's finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* Thus, we cannot substitute our judgment for that of the fact finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained.

■ Under Texas law, there does exist a common-law right to privacy. *Billings v. Atkinson*, 489 S.W.2d 858, 859 (Tex.1973); *Farrington v. Sysco Food Services, Inc.*, 865 S.W.2d 247, 253 (Tex.App.—Houston [1st Dist.] 1993, writ denied). There are three elements to consider: (1) an intentional intrusion; (2) upon the seclusion, solitude, or private affairs of another; (3) which would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993); *Farrington*, 865 S.W.2d at 253; *Gill v. Snow*, 644 S.W.2d 222, 223–24 (Tex.App.— Fort Worth 1982, no writ); RESTATEMENT (SECOND) OF TORTS, § 652B (1977).[7] Courts have also required that the intrusion be unreasonable, unjustified, or unwarranted. *Billings*, 489 S.W.2d at 860; *Farrington*, 865 S.W.2d at 253. Pursuant to the definitions above, we find the evidence sufficient to support a jury finding that Household violated the Driscols' privacy under either a legal or factual sufficiency standard of review.

■ Although it conflicted, there is evidence sufficient to support the first element of the Driscols' privacy cause of action. Ms. Driscol testified that she asked the Household collectors to stop calling her at work, and eventually wrote a certified letter to Household in an attempt to stop the calls to work. The calls, however, did not stop. Moreover, she claimed that she asked the Household collectors to stop the multiple calls in a single day at home, and to stop the early morning and late evening calls. Again, according to Ms. Driscol, the offensive calls did not stop. Although Household witnesses

the jury's liability findings on the Driscols' other causes of action. Since we have determined that the Driscols cannot recover on those causes of action under the one satisfaction rule, we need not address those points of error and we overrule them as moot.

6. Household does not challenge the sufficiency of the evidence to support Allied's liability for invasion of the Driscols' privacy.

7. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

denied that Household made multiple calls to Ms. Driscol in a single day, or that calls continued to Ms. Driscol's work after she asked in writing that they stop, the jury was free to believe Ms. Driscol over the Household witnesses. That Household continued to make offensive calls after Ms. Driscol requested that they stop is some evidence to establish that the calls were made as an intentional intrusion on her privacy.

Furthermore, the nature and frequency of the calls pursuant to Ms. Driscol's version of the facts establishes the second two elements of the cause of action. Receipt of multiple calls in any one day, often prior to normal waking or after normal retiring hours and often at work even after requests to stop, with a hostile, profane individual on the other end of the line is sufficient to constitute an intrusion upon the Driscols' seclusion, solitude, or private affairs which would be highly offensive to a reasonable person. As the Dallas Court of Appeals found in *Futerfas v. Park Towers:*

> No doubt exists that harassing telephone calls are overt, unlawful acts. They are overt, unlawful acts for at least two reasons. First, they are unwarranted invasions of the right of privacy which constitute a legal injury for which a remedy exists. *See Billings v. Atkinson,* 489 S.W.2d 858, 860 (Tex.1973). They constitute an intrusion upon a person's seclusion or solitude and, therefore, invade privacy. *See National Bonding Agency v. Demeson,* 648 S.W.2d 748, 749 (Tex.App.—Dallas 1983, no writ). *See generally* W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 117 (5th ed.1984) (stating, at page 855, that persistent and unwanted telephone calls have been held to be invasions of privacy). Second, they cause the telephone of another to ring repeatedly or are repeated anonymous telephone communi-

cations made in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass or offend another in violation of TEX. PENAL CODE ANN. § 42.07(a)(4) (Vernon Supp.1985).

707 S.W.2d 149, 156–57 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

We further find that the phone calls, as the Driscols recounted them, rose to the level of unreasonable, unjustified, unwarranted behavior. In fact, many of the actions the Driscols allege against Household violate the Texas Fair Debt Collection Practices Act.[8] Collection actions taken in violation of the law are not justified, reasonable, or warranted. We therefore find the evidence sufficient to support the jury's liability finding on the Driscols' invasion of privacy cause of action.

Accordingly, we overrule Household's ninth point of error.

### ALLIED'S STATUS AS AN AGENT OF HOUSEHOLD

In its third, fourth, and sixth points of error, Household challenges the sufficiency of the evidence to support the jury's findings that Allied was Household's agent, rather than an independent contractor, and that Allied's actions were authorized or ratified by Household.

#### 1. Independent Contractor or Agent?

In its third point, Household challenges the sufficiency of the evidence to support the jury's finding that Allied was Household's agent rather than an independent contractor. An independent contractor is one "who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details."

---

8. Section 392.302 of the Texas Debt Collection Act makes it illegal, to attempt to collect a debt by:

(1) using profane or obscene language or language intended to abuse unreasonably the hearer or reader;

(2) placing telephone calls without disclosing the name of the individual making the call and with the intent to annoy, harass, or threaten a person at the called number;

. . .

(4) causing a telephone to ring repeatedly or continuously, or making repeated or continuous telephone calls, with the intent to harass a person at the called number.

TEX. FIN.CODE ANN. § 392.302(1)(2)(4) (Vernon 1998).

*Pitchfork Land and Cattle Co. v. King,* 162 Tex. 331, 346 S.W.2d 598, 602–03 (1961); *Duran v. Furr's Supermarkets, Inc.,* 921 S.W.2d 778, 786 (Tex.App.—El Paso 1996, writ denied); *Hoechst Celanese Corp. v. Compton,* 899 S.W.2d 215, 220 (Tex.App.—Houston [14th Dist.] 1994, no writ). Factors used in determining whether a party is an independent contractor are:

(1) the independent nature of the contractor's business;

(2) his obligation to supply necessary tools, supplies, and materials;

(3) his right to control the progress of the work except as to final results;

(4) the time for which he is employed; and

(5) the method by which he is paid, whether by the time or by the job.

*Pitchfork Land and Cattle Co.,* 346 S.W.2d at 603; *Duran,* 921 S.W.2d at 786; *Hoechst Celanese Corp.,* 899 S.W.2d at 220; *William Sommerville & Son, Inc. v. Carter,* 571 S.W.2d 953, 956 (Tex.Civ.App.—Tyler 1978), *aff'd,* 584 S.W.2d 274 (Tex.1979). To determine whether one is acting in the capacity of an independent contractor, one must measure the amount of control that the employer exerts or has a right to exert over the details of the work. *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 591 (Tex.1964); *Duran,* 921 S.W.2d at 786; *Hoechst Celanese Corp.,* 899 S.W.2d at 220. As this Court stated in *Duran,* the most fundamental of these factors is the right of control. *Duran,* 921 S.W.2d at 786 (citing *Ross v. Texas One Partnership,* 796 S.W.2d 206, 210–11 (Tex.App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991)).

▪ With the previously stated standards of review for evidentiary sufficiency in mind, we turn to a review of the evidence. The record in the instant case demonstrates that in the course of its business, Allied handled accounts for other creditors; was a separately licensed debt collector; operated its own facilities and used its own equipment; maintained its own bonding and insurance; issued its own company policy manual and procedures to collect the accounts accepted by it; trained, supervised, paid, and set hours for its own employees; received its own telephone bills; managed the day to day activities of the collectors; tried to maximize its own profitability by concentrating on only 20 percent of Household's accounts; paid its own rent; and was paid on a contingency basis. According to Household's witnesses, Household could assign goals pursuant to the collection agreement entered into with Allied, but it did not have the right to tell Allied how to attain its predetermined goals. In addition, Household did not have the right to instruct or direct Allied's employees how to communicate with debtors.

Household's "Agency Work Standards," however, show that Household retained the right of control over significant details of Allied's work. The standards required Allied to: activate the account within 48 hours of receipt; work the account daily the first week; send an initial letter to the debtor within five working days; call a valid residence or business phone weekly; send three letters within the first 60 days; make phone attempts at a variety of hours; call an account both morning and evening for two days after a promise to make a payment is broken; send a "broken promise" letter within 24 hours of a broken promise to pay; and conduct a supervisory review every 30 days if the account is not paying. In addition, Household's contract with Allied required Allied to dedicate a group of employees exclusively to Household accounts subject to Household's review and approval. Household required Allied to limit the number of accounts worked for those collectors assigned to Household accounts. Furthermore, there was evidence that Household could, and when pressed, did control Allied's conduct. Both Ms. Driscol and Gary Thompson testified that Allied's conduct ceased after Thompson called Household to complain.

Although Allied maintained some autonomy, we find that the evidence was legally and factually sufficient for the jury to conclude that Household maintained sufficient right of control over Allied and moreover, exerted enough control over the details of Allied's work to make Allied the agent of Household. Accordingly, we overrule Household's third point of error.

## 2. Allied's Authority to Act

In its fourth point, Household challenges the sufficiency of the evidence to support the jury's finding that Allied's actions were within the authority of the agency Household granted. In this case, Allied had the authority to collect debts on Household's accounts. An agent's implied authority may not be extended beyond what is proper, usual, and necessary to carry out the agent's duties. *See Sociedad De Solaridad Social "El Estillero" v. J.S. McManus Produce Co.,* 964 S.W.2d 332, 334 (Tex.App.—Corpus Christi 1998, no pet.). We fail to comprehend how the outrageous conduct the Driscols claim Allied engaged in, particularly the death and bomb threats, are in any way proper, usual, or necessary to the collection of a debt. Moreover, Household's contract with Allied specifically required Allied to comply with all federal and state laws, rules, and regulations. Much of Allied's conduct including the multiple calls in a given day, calls to the workplace after requests to cease, foul language, and early morning and late night calls are in violation of Texas law. *See* TEX. FIN.CODE ANN. § 392.302(1)(2)(4) (Vernon 1998). There is no evidence in the record tending to expand the scope of Allied's agency beyond the terms of the written contract. Accordingly, we find that the evidence is insufficient to support the jury's finding that Allied's acts were authorized. We therefore sustain Household's fourth point of error.

## 3. Ratification

We find, however, that there is evidence sufficient to support the jury's finding that Household ratified Allied's conduct. The elements of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Motel Enterprises, Inc. v. Nobani,* 784 S.W.2d 545, 547 (Tex.App.—Houston [1st Dist.] 1990, no writ). Although John Matusiak testified that Household had no knowledge of Allied's conduct until this lawsuit was filed, Ms. Driscol testified that she called Household's customer service department to complain about Allied's conduct.

She maintained that her attempt was to no avail and Allied's abusive conduct continued. Ms. Driscol's complaint regarding Allied's conduct is at least some evidence to show that Household continued to allow Allied to collect debts on its behalf after notice of Allied's malfeasance. Moreover, if the jury believed Ms. Driscol's version of Household's own conduct, which it apparently did, it becomes more likely that Household would tolerate similar conduct on the part of its agents.

The evidence regarding ratification, or lack thereof, is not overwhelming. The record contains only Ms. Driscol's assertion that she told Household about Allied's conduct on the one hand, and Household's denial of any knowledge until Ms. Driscol filed suit on the other. Although there is a letter in evidence from John Matusiak of Household to Henry Mauriss of Allied essentially condemning Allied's conduct in Ms. Driscol's case and in other instances, the letter was written after the Driscols filed their lawsuit. If the jury believed that Ms. Driscol adequately informed Household of Allied's misconduct at some point before she filed suit and the misconduct continued anyway, then the letter came only after Household had knowingly tolerated Allied's behavior. The jury therefore could reasonably have viewed the letter as ineffective to counter Household's previous ratification.

Household further contends that it is impossible for it to have ratified Allied's conduct because the Driscols never paid their debt and therefore Household never received or retained any benefit from Allied's actions. Such a holding, however, would allow a creditor principal to escape liability for its agent's outrageous harassment of a debtor in the fortuitous event that the debtor happened to be penniless and unable to pay. We find that the better interpretation of retention of benefits as applied to the facts of this case is to hold that the principal receives a benefit in the form of the agent's continued attempts to collect from the principal's debtor. Accordingly, we overrule Household's sixth point of error.[9]

9. Household's fifth point of error challenges the sufficiency of the evidence to support House-

## MALICE

■ In its twelfth point, Household questions the legal and factual sufficiency of the evidence to support the jury's finding that Household acted with malice in invading the Driscols' privacy.[10] Generally, malice is conduct specifically intended to cause a substantial injury to another or carried out with actual awareness that the act will, in reasonable probability, result in substantial injury. A malice finding requires evidence of ill will, spite, evil motive, or intent to purposefully injure another. *Allied Bank West Loop, N.A. v. C.B.D. & Assoc., Inc.,* 728 S.W.2d 49, 58 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). Household argues that there is no evidence that Household specifically intended to cause a substantial injury to the Driscols, or that Household acted with any actual awareness that its conduct would, in reasonable probability, result in substantial injury.

■ The jury charge, however, did not include in the definition of "malice" an instruction that Household had to have any specific intent to cause substantial injury, or any awareness that substantial injury would likely result from its conduct. Rather, the jury was instructed only that malice means "conduct willfully committed with ill will, evil motive or gross indifference or reckless disregard for the rights of others." Household made no objection to the definition on the record. The term "willfully" was not defined. In the absence of an objection, the sufficiency of the evidence is usually measured against the statement of law contained in the charge, even if it is defective. *See Sage Street Assoc. v. Northdale Constr. Co.,* 863 S.W.2d 438, 447 (Tex.1993) (court of appeals should measure sufficiency of the evidence against measure of damages actually submitted to the jury rather than what court believes to be correct measure of damages). Accordingly, we will review the sufficiency of

the evidence to support malice as defined in the charge.

■ The Driscols testified that Household continued to call Ms. Driscol at work after several verbal requests and one written request not to do so. Household also continually called the Driscol residence at odd hours and multiple times in any given day all the while using profanity and abusive language in violation of the Texas Fair Debt Collection Practices Act. According to Household's own testimony, collectors received training in the Federal Debt Collection Act, yet according to the Driscols' testimony, Household collectors repeatedly acted in violation of the law. Ms. Driscol testified that Household's conduct continued despite her repeated pleas to Household to halt the harassing conduct on the part of Household collectors and later on the part of Allied. When Gary Thompson, president of People Lease, contacted Household regarding Allied's repeated disruptive calls to his business, however, the harassment stopped. That Ms. Driscol, a consumer debtor, was ignored while Thompson got immediate results is some evidence that Household recognized the error of its conduct and could have stopped the conduct at any time, but chose not to do so in response to a consumer complaint.

Household, however, points to its prompt response after Thompson's complaints as evidence that it did not tolerate, much less ratify, any malfeasance on the part of its own or Allied's collectors. We recognize that evidence that the harassment stopped as soon as Thompson contacted Household could be taken in two ways. Although a different jury on a different day may have considered this evidence of Household's reasonableness, this jury was entitled to believe Ms. Driscol and view it as evidence of Household's willful disregard for her rights. Accordingly, we find the evidence sufficient under both a

hold's joint and several liability for actual damages awarded against Allied. Since we have found the evidence sufficient to support Household's ratification of, and thereby responsibility for, Allied's conduct, we need not address Point of Error Five which argues joint and several liability as a theory of Household's responsibility for Allied's actions.

10. Household does not challenge the sufficiency of the evidence to support the jury's finding that Allied acted with malice in invading the Driscols' privacy.

legal and factual standard to support the jury's finding that Household acted with at least gross indifference or reckless disregard for Ms. Driscol's rights. We therefore overrule Household's twelfth point.[11]

## ACTUAL DAMAGES

In its thirteenth [12] and fifteenth through twentieth points of error, Household challenges the sufficiency of the evidence to support the jury's actual damage awards against both Household and Allied and alternatively urges the Court to suggest a remittitur. Since we have determined that the Driscols may recover only on their invasion of privacy cause of action, we will address the adequacy of the evidence to support the damages awarded on that theory of recovery only. The trial court submitted the relevant damage question as follows:

> What sum of money if paid now would be the reasonable damages suffered by Plaintiffs, Marianne and/or Albert Driscol, as a result [of] Household Credit Services Inc.'s invasion of their privacy?
>
> > In answering this Question you may consider only the elements of damages listed below. You are to consider each element of damages separately, so as not to include damages for one element in any other element. Do not include in your answer any amount that you find Marianne Driscol and/or Albert Driscol could have avoided by the exercise of reasonable care.
>
> (1) Lost wages and earning capacity in the past;
>
> (2) Lost wages and earning capacity that will in reasonable probability be incurred in the future;
>
> (3) Mental anguish, emotional distress and loss of enjoyment of life in the past;

(4) Mental anguish, emotional distress and loss of enjoyment of life that in reasonable probability will be incurred in the future;

(5) Medical expenses, if any, that in reasonable probability will be incurred in the future;

(6) Physical pain and suffering, if any, in the past;

(7) Physical pain and suffering, if any, that in reasonable probability will be suffered in the future.

ANSWER IN DOLLARS AND CENTS, IF ANY, OR 'NONE' FOR EACH PLAINTIFF.

MARIANNE DRISCOL:_____ ALBERT DRISCOL:_____

The trial court submitted an identical question for damages against Allied. The jury found $75,000 each for Marianne and Albert against Household, and $150,000 for each against Allied.

■■ When a damage question is submitted in broad form with all damage elements combined in a single sum, as it was in this case, so long as the aggregate evidence for all elements of damage supports the award, we must uphold the jury's verdict. *Housing Authority of City of El Paso v. Guerra*, 963 S.W.2d 946, 952 (Tex.App.—El Paso 1998, writ denied). Accordingly, we review the various elements submitted to determine whether the total damage awards can be supported by an aggregate of the individual elements. We note at the outset that there is no evidence in the record of any lost wages or earning capacity, physical pain and suffering, or medical expenses for Mr. Driscol. The Driscols' briefing points us to none. Similarly, we find no evidence of physical pain and suffering or medical expenses for Ms. Driscol in the record. Again, the Driscols' briefing points us to none. Accordingly, we will address damages in terms of Ms.

11. In its eleventh point, Household challenges the sufficiency of the evidence to support the jury finding that it was grossly negligent. Since no cause of action related to gross negligence has survived Household's first point of error alleging violation of the one satisfaction rule, it is unnecessary for us to address Household's eleventh point.

12. Household's fourteenth point of error challenges the sufficiency of the evidence to support the jury's damage findings with regard to the unreasonable debt collection efforts and negligence causes of action. Since our determination of Household's first and second points of error have precluded recovery on those theories, we need not address Household's fourteenth point.

Driscol's lost wages and earning capacity and both Driscols' mental anguish.

### 1. Lost Wages and Earning Capacity

■ Ms. Driscol testified that she made $8 per hour at People Lease. When she quit her job and moved to Truth or Consequences because she could not take the harassment anymore, she found a bank job at $4.25 per hour. By the time of trial, Ms. Driscol was working for the same bank making $5.49 per hour. She maintained that she could not look for a better opportunity in a larger city because she feared Household or Allied would look for her in a bigger community.

According to Gary Thompson, Ms. Driscol resigned from People Lease on April 7, 1992. We are unable, however, to determine the exact date Ms. Driscol left El Paso and got her job in Truth or Consequences, nor can we determine exactly when she received the increase to $5.49 per hour. Assuming that Ms. Driscol worked at the $4.25 per hour rate from the time she left People Lease (April 7, 1992) until the date of trial (August 14, 1995), even though there was testimony that she remained unemployed for some period of time while still living in El Paso, her lost past wages would amount to $26,400.[13] This figure assumes a forty-hour work week for the approximately 176 weeks between her departure from People Lease and the start of trial.

■ Although Ms. Driscol did not offer any evidence to support the length of time she planned to continue working, loss of earning capacity that a plaintiff will suffer in the future is always uncertain and is left largely to the jury's sound judgment and discretion. *Border Apparel–East, Inc. v. Guadian,* 868 S.W.2d 894, 897 (Tex.App.—El Paso 1993, no writ). There is no general rule governing the proof required, except that each case is judged on its particular facts and the damages need be proved only to the degree to which they are ascertainable. *Id.* Recovery for loss of future earning capacity does not require a showing of lost earnings, although the most obvious and direct proof of loss of earning capacity is loss of earnings

themselves. *Id.* In this case, Ms. Driscol testified that she would not feel safe from Household and Allied in a large community where she would have more financial opportunity. Accordingly, we find that the jury would have been justified in concluding that Ms. Driscol would always earn somewhat less than she could earn in a larger community. Even though she had received raises at her new job in Truth or Consequences, Ms. Driscol was still earning less than she had earned in El Paso. On that basis, there is evidence to support a finding that the 52–year–old Ms. Driscol, if she worked to an average retirement age of 65, would continue to lose $2.51 per hour ($8 less $5.49) in earning capacity, or $100.40 per week for approximately thirteen years, or $67,870.40.

Accordingly, we find evidence sufficient to support a jury award of approximately $94,270 ($67,870 plus $26,400) in past lost wages and future lost earning capacity.

### 2. Mental Anguish

■ In addressing mental anguish damages we are guided by the Texas Supreme Court's decision in *Saenz v. Fidelity and Guar. Ins. Underwriters,* 925 S.W.2d 607 (Tex.1996) and our own opinion in *Worsham Steel Co. v. Arias,* 831 S.W.2d 81 (Tex. App.—El Paso 1992, no writ). Mental anguish is a compensable injury for which damages may be awarded. *Worsham Steel,* 831 S.W.2d at 85. The process of awarding damages for such an injury is difficult because mental anguish constitutes a subjective, nonpecuniary loss. *Id.* Since mental anguish is a non-pecuniary loss, the amount awarded is generally within the broad discretion of the jury; such discretion necessarily carries with it the risks of passion, prejudice, speculation, and bias. *Id.* In recognition of the risks involved in awarding discretionary damages, Texas courts have found it essential to restrict the types of injuries that qualify as mental anguish. *Id.* Mental anguish has been defined in such a way as to imply:

> [A] relatively high degree of mental pain and distress; it is more than mere disap-

---

**13.** This figure represents $150 per week difference between Ms. Driscol's $8 hourly wage and the $4.25 hourly wage based on a forty-hour week times 176 weeks.

pointment, anger, resentment, or embarrassment, although it may include all of these, and it includes mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*Worsham Steel*, 831 S.W.2d at 85–86 (citing *Trevino v. Southwestern Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ)); *see also Havens v. Tomball Community Hosp.*, 793 S.W.2d 690, 692 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *Underwriters Life Ins. Co. v. Cobb*, 746 S.W.2d 810, 819 (Tex.App.—Corpus Christi 1988, no writ); *Group Hosp. Services, Inc. v. Daniel*, 704 S.W.2d 870, 878 (Tex. App.—Corpus Christi 1985, no writ); *Gill v. Snow*, 644 S.W.2d 222, 224 (Tex.App.—Fort Worth 1982, no writ); *Ryder Truck Rentals, Inc. v. Latham*, 593 S.W.2d 334, 339 (Tex. Civ.App.—El Paso 1979, writ ref'd n.r.e.).

■ Moreover, in *Saenz v. Fidelity and Guaranty Insurance Underwriters*, the Supreme Court reaffirmed *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex.1995), and found that mental anguish damages could not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Saenz*, 925 S.W.2d at 614 (citing *Parkway*, 901 S.W.2d at 444). Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. *Saenz*, 925 S.W.2d at 614.

A review of appellate courts' decisions reveal a common thread in sufficiency cases. *See State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 600–601 (Tex.App.—El Paso 1991, writ denied) (plaintiffs felt intimidated, confused, frightened, "betrayed, scared, angry and devastated" and were "unable to sleep" held sufficient to prove mental anguish); *Skaggs Alpha Beta, Inc. v. Nabhan*, 808 S.W.2d 198, 202 (Tex.App.—El Paso 1991, no writ) (plaintiff descriptively testified that she suffered chronic headaches which affected her domestic environment and had trouble sleeping); *J.B. Custom Design & Building v. Clawson*, 794 S.W.2d 38, 43 (Tex. App.—Houston [1st Dist.] 1990, no writ) (plaintiffs experienced "a tremendous amount of mental anguish, embarrassment, and distress" held legally and factually sufficient to support award for mental anguish); *City of Ingleside v. Kneuper*, 768 S.W.2d 451, 460 (Tex.App.—Austin 1989, writ denied) (plaintiff, among other things, was in "total panic" and "great fear," was "nervous and irritable," and he would "bite his nails" and "pace the floor" held legally and factually sufficient to support award for mental anguish). Texas courts have interpreted the definition of mental anguish to mean that recovery is warranted in such cases where the plaintiff's mental pain has risen to such a level that it has rendered him incapable of dealing with certain everyday activities. For instance, as a result of the mental pain, the plaintiff suffers from a myriad of negative emotions. Some of these emotions may manifest themselves in such a way as to make it difficult for the plaintiff to eat, sleep, work, socially interact, or carry on any other activity which, until the time of the alleged injury, he could accomplish on a day-to-day basis without difficulty. *Worsham Steel*, 831 S.W.2d at 86.

■ With these requirements in mind, we now review the evidence. Ms. Driscol testified that she was "devastated" by Household's collection tactics. She called the harassment "upsetting," "embarrassing," and "humiliating." She would stay up all night crying after receiving calls. She remained upset "all day" at work and feared that she would lose her job. She had trouble concentrating on her work and would sometimes go to the ladies' room and cry. She was afraid to answer the phone or her door. Ms. Driscol also testified of physical problems such as diarrhea, chest pains, and hyperventilation she suffered as a result of Household's activities. Although she and her husband previously went out with friends and attended church regularly, after Household's phone calls started she no longer went out. Rather, she would just "sit home and vegetate." Ms. Driscol related that her husband even had to do all of the cooking, cleaning, and laundry

because, "I just don't want to do anything. They've—They killed my spirit." She did not care whether she lived or died.

After Allied began its collection efforts, and particularly after the death and bomb threats, Ms. Driscol became so afraid that she believed a would-be attacker could have been sent by Allied. She felt it necessary to flee El Paso, leaving elderly parents behind. Even after moving to Truth or Consequences where she felt no one would look for her, Ms. Driscol testified that she was "afraid even to go out to a church ... I don't know where they're going to come from, and I just won't go out in public anywhere. And when I work at the bank, I watch everybody that comes in there." Even before she left El Paso, Ms. Driscol was "scared to death" every time she heard a noise "because of what Rick Lewis had said." She put bars on her doors and bought a dog. Three years later during trial, Ms. Driscol was still so afraid of Lewis that the prospect of being in the same room with him during his testimony made her nervous.

 We find that Ms. Driscol's testimony established a substantial disruption in her daily routine, both from Household's and Allied's conduct. Moreover, the degree of disruption in this case is sufficient to justify the damages awarded her. Household's conduct caused her to cease most social interaction such as going out with friends and to church, a condition that persisted for almost three years up to the time of trial. She was so nervous that she lost any ability to perform everyday household functions. Her work was disrupted because she could not concentrate and sometimes she became so upset that she had to go to the ladies' room to cry. The more extreme conduct of Allied caused her to fear for her life, precipitated the end of her career at People Lease, and forced her to move to another, smaller community where the collectors would not look for her. She still closely watches patrons entering the bank where she works, and even by the time of trial, she was afraid to share a courtroom with Rick Lewis. This evidence shows extreme disruption in Ms. Driscol's life and, together with the evidence of lost wages and earning capacity, supports the total jury award on the invasion of privacy cause of

action of $75,000 against Household and $150,000 against Allied.

We acknowledge that there was some evidence to suggest that other factors may have caused Ms. Driscol mental anguish: after having lost a good job in Massachusetts, the Driscols moved in with their sick parents in El Paso; Mr. Driscol was unable to find employment in El Paso and Ms. Driscol found a high stress, low paying job working for People Lease; Ms. Driscol was very upset by not being able to pay her bills; a drunk driver crashing through the Driscols' living room immediately before the phone harassment began was so "traumatic" and "devastating" to Ms. Driscol that she was scared to death and afraid to sit in her living room. Additionally, Household presented expert psychological testimony that Household's and Allied's actions had caused no lasting psychological damage to Ms. Driscol. The jury, however, was free to reject Household's expert testimony. The jury was also free to weigh Ms. Driscol's testimony about the impact the phone harassment had on her against the evidence of other stressful factors in her life. We do not find it outside the realm of reason for the jury to conclude that Household's and Allied's conduct, separate from all the other admittedly difficult circumstances Ms. Driscol faced, caused her to suffer substantial mental anguish. Accordingly, we overrule Household's thirteenth, fifteenth, seventeenth and nineteenth points of error.

 Mr. Driscol, on the other hand, testified only that the phone harassment "hurt" him "a lot," and that it had been "real hard" for him. Although he recounted being angry, upset, frustrated and "pissed off," Mr. Driscol testified that he was not "seriously angry" about Household's or Allied's behavior. He did relate that he had called for counseling because he was "having some problems," but he had not gone for the counseling at the time of trial. He recounted no problems with carrying on his regular daily activities. We do not find that the effect of Household's and Allied's conduct on Mr. Driscol, as he related it at trial, rises above the level of mere disappointment, anger, resentment, or embarrassment. The evidence simply does not show the pain, distress, an-

guish, grief, sever disappointment, indignation, wounded pride, shame, despair, public humiliation, or other evidence of a high degree of mental pain and distress normally associated with mental anguish. *See Worsham Steel*, 831 S.W.2d at 87; *Saenz*, 925 S.W.2d at 614. Accordingly, we find no evidence to support Mr. Driscol's damage award and we sustain Household's sixteenth point of error.[14]

## EXEMPLARY DAMAGES

■■■■■■ In its twenty-first through twenty-fourth points, Household challenges the trial court's award of exemplary damages against it and the exemplary damages against Allied for which Household was held responsible. In reviewing punitive damages, the appellate court should consider whether the award of exemplary damages punishes the defendant justly. The Texas Supreme Court set out five factors for consideration: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which the conduct offends a public sense of justice and propriety. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). Additionally, the court may examine: the frequency of the wrongful conduct; the size of an award needed to deter similar wrongs in the future; and the financial ability of the defendant. *Zubiate*, 808 S.W.2d at 604. The court should also consider whether, under the circumstances of the case, the award is reasonably proportional to actual damages. *Kraus*, 616 S.W.2d at 910. No particular ratio, however, is dispositive in this non-negligence case. *Id.*

1. *Exemplary Damages Awarded Against Household*

■■■■■■ In this case, the jury awarded the Driscols $500,000 in exemplary damages against Household on their invasion of privacy cause of action. This figure represents slightly more than a three-to-one ratio of exemplary damages to the jury's original actual damage finding. We have, however, found that there is no evidence to support the jury's damage finding for Mr. Driscol. Accordingly, we must reverse the jury's exemplary damage finding as to Mr. Driscol. *Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 249 (Tex. App.—Houston [14th Dist.] 1996, no writ). This presents something of a dilemma because the jury's single exemplary damage award was not apportioned between Mr. and Ms. Driscol as the actual damage award was. Generally, it is inappropriate for the appellate court to simply reduce an exemplary damage award by the same proportion that it reduces actual damages. *See Tatum v. Preston Carter Co.*, 702 S.W.2d 186, 188 (Tex. 1986) (reasonable proportion rule does not, standing alone, serve to fix a particular ratio; court of appeals' proportional reduction of exemplary damage in exact ratio as reduction in actual damages was erroneous). In this case, however, the jury rendered equal actual damage verdicts to the Driscols. Accordingly, we use the jury's equal actual damage award as a guide and find it appropriate under the facts of this case to reduce the single exemplary damage award by half in order to eliminate exemplary damages awarded to Mr. Driscol.

■■■■ Having eliminated the exemplary damage award to Mr. Driscol, we turn to an analysis of the *Kraus* factors in reference to the remaining exemplary damages. We have already conducted a factual sufficiency review to support liability earlier in this opinion and we will not reiterate the rather lengthy factual history in full here. In summary, we find that the evidence supporting liability in this case also supports a jury award of $250,-000 in exemplary damages against Household. Household's conduct, as Ms. Driscol recounted it and as the jury was entitled to believe it to be, represents overbearing conduct in violation of Texas and federal debt collection law. Household's collectors hounded Ms. Driscol by calling her repeatedly in any one day; they called before and after hours allowed by Texas and federal law;

---

14. Our disposition of this point, which results in a take-nothing judgment for Mr. Driscol, makes it unnecessary for us to address Household's eighteenth and twentieth points regarding a remittitur of Mr. Driscol's damage award.

they used abusive, threatening language; and they continued to contact Ms. Driscol at work after at least one written request not to do so. Ms. Driscol's situation, that of a debtor unable to pay her bills, is precisely the sort of relatively powerless person the debt collection laws are designed to protect. An invasion into Ms. Driscol's private affairs of the magnitude represented by Household's conduct all because of a two or three thousand dollar debt is certainly offensive to any sense of justice and propriety.

## 2. Exemplary Damages Awarded Against Allied

As with the exemplary damages awarded to the Driscols against Household, the jury made a single exemplary damage award to the Driscols against Allied, this time in the amount of $2 million. Also, as with the actual damages awarded against Household, the jury found two separate equal awards against Allied each for Mr. and Ms. Driscol on their invasion of privacy claim. For the same reasons we found that we must reverse half of the exemplary damage award against Household, we also reverse half of the exemplary damage award against Allied.

■ Similarly, we find the remaining exemplary damage award of $1 million against Allied justified pursuant to the *Kraus* factors for the same reasons we found the exemplary award justified against Household. Allied's conduct was similar to, but even more outrageous than Household's thus justifying a proportionately larger award. Allied's Carol Lamb threatened to make Ms. Driscol's life miserable, and then proceeded to do so by, among other things, threats and foul language; calls outside the time and frequency limits set by Texas and federal law; a barrage of calls to Ms. Driscol's workplace that effectively shut the business down for a period of two hours on at least one occasion; and finally, a bomb threat. Rick Lewis threatened Ms. Driscol's life. This conduct is, like the conduct of Household, well outside the bounds of any public sense of justice and propriety.

## 3. Conclusion: Exemplary Damages

We sustain, in part, Household's twenty-first through twenty-fourth points of error and order a remittitur in the amount of exemplary damages awarded to the Driscols against Household on their invasion of privacy claim in the amount of $250,000. We further order a remittitur in the amount of exemplary damages awarded against Allied on the Driscols' invasion of privacy claim in the amount of $1 million dollars. Finally, since we have reversed actual damages on all causes of action except invasion of privacy, we reverse and render judgment that the Driscols take nothing on exemplary damage awards based on all causes of action other than invasion of privacy.

## JOINT AND SEVERAL LIABILITY FOR EXEMPLARY DAMAGES

■ In its seventh point of error, Household maintains that, pursuant to Section 41.006 of the Texas Civil Practice and Remedies Code, it cannot be held jointly and severally liable with Allied for exemplary damages. TEX. CIV. PRAC. & REM.CODE ANN. § 41.006 (Vernon 1997). We have already found, however, that Household ratified Allied's conduct and is therefore liable for damages awarded against Allied on that ground. *See Purvis v. Prattco, Inc.*, 595 S.W.2d 103, 104 (Tex.1980) (principal can be held liable for exemplary damages based on agent's conduct if principal or a manager of the principal ratified or approved the act). Accordingly, it is unnecessary for us to address the issues raised in Household's seventh point.

## IMPROPER ARGUMENT

In its twenty-fifth through thirty-second points of error, Household contends that several statements made by the Driscols' attorneys during argument were improper and require reversal. Household maintains that the following statements unfairly portrayed Household as a demon, a terrorist, and a perjurer:

- But we need not and you must not expect that when a demon interferes, a company like Household ... that demon may escape responsibility by claiming

that the hit man, Allied, was an independent contractor.

. . .

● The recent Oklahoma City bombing and the Unabomber scares have not made their [the Driscols'] life any better.

. . .

● I would sharply characterize it as a phony exhibit.

. . .

● When you look at this exhibit, if indeed you do, it doesn't take a rocket scientist to see that it's not real.

Household contends that the following statements improperly raised punishment issues at the compensatory stage of the trial: [15]

● I don't want to offend you, but we all know that a couple of million dollars wouldn't impact Household.

. . .

● Back, in our jury system, we rely upon you, the conscience of the community, to say, how much do we need to award to send a message to say that we're not going to allow this kind of stuff?

. . .

● Now, you know where we got that figure from? There was evidence in this case about a California jury awarding $3 million in a case where the circumstances were less egregious than the ones you heard over the last week.

Household maintains that the following statement improperly informed the jury of the effect of its answer to the question establishing Allied's agency relationship with Household:

Question 21 on page 17 is the agency question. And remember that Allied doesn't exist anymore. Allied is gone. So you

need to answer all of those questions yes, or justice won't be done in this case.

Finally, Household complains of the Driscols' request that the jury put themselves in the Driscols' place, arguing, "[a]sk yourselves, would it be disturbing to me, would it cause me some emotional distress . . . ."

 Although we are concerned with some of counsel's comments, particularly those comments urging issues more appropriate to the exemplary damages phase of the trial and the comment informing the jury of the effect of their answers to the agency questions, we note that Household failed to object to any of the comments. An appellant must preserve argument error by proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979). Accordingly, Household waived its complaints regarding the comments. Even if error is preserved, an appellant must show that the argument was not curable by an instruction from the trial court. *Id.* We do not find that any of the comments counsel made were so inflammatory that they could not have been cured by instruction. Accordingly, we overrule Household's twenty-fifth through thirty-second points of error.

## ADMISSION OF EVIDENCE

In its thirty-third point, Household maintains that the trial court committed reversible error by admitting evidence of a California verdict for unfair debt collection practices. Household contends that evidence of the $3 million verdict was irrelevant and overly prejudicial. The evidence was introduced during cross-examination of John Matusiak as follows:

Q: Well, didn't you testify, under oath, that you were aware of judgments of more than $3 million?

. . .

Were you aware that conduct such as yours which violated the law, that one persisted in—and was your awareness prior to

15. The trial had been bifurcated pursuant to *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994).

1992, that amounts in excess of $3 million were awarded against such activity?

. . .

 A: Okay. I got knowledge of it—basically I was handed a document that was produced to Mr. Gage. And he specifically showed me this judgment [at the witness's deposition.] And the basic answer was: I could see it now, but I don't recall reading this document.

Before the witness was allowed to answer, however, the trial court had instructed the jury that:

> [K]nowledge of other lawsuits is not being introduced to determine your damage issue in this case. You base the damages in this case based on what you think the conduct was, if there was any wrongful conduct, not upon what some other jury did in some other state.

> This testimony is being issued simply for the sole reason to show what knowledge this witness would have of potential liability for wrongful acts.

Generally, a judgment from another lawsuit is not admissible to show matters adjudicated therein if the prior lawsuit did not involve parties and issues identical to the present suit. *Silva v. Enz*, 853 S.W.2d 815, 818 (Tex.App.—Corpus Christi 1993, writ denied). The Driscols, however, pleaded causes of action for gross negligence, willful conduct, and malice. Thus, evidence of Household's knowledge regarding the potential consequences of its actions was relevant. Moreover, the trial court instructed the jury to limit its consideration of the evidence to the issue of Household's knowledge. In the absence of evidence to the contrary, the jury is presumed to follow the trial court's instructions. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 167 (Tex. 1982); *Owens–Corning Fiberglas Corp. v. Martin*, 942 S.W.2d 712, 718 (Tex.App.— Dallas 1997, no writ). Accordingly, we find no harm in the admission of the evidence and we overrule Household's thirty-third point of error.

**CONCLUSION**

Having sustained Household's first and second points, we reform the trial court's judgment to reflect recovery only on the Driscols' invasion of privacy cause of action against both Household and Allied.[16] Having sustained Household's sixteenth point, we render a take-nothing judgment on damages for Albert Driscol. In light of our finding of no damages for Albert Driscol, we order a remittitur in the amount of $250,000 on the exemplary damages awarded against Household, and in the amount of $1,000,000 on the exemplary damages awarded against Allied. Having overruled Household's remaining points of error, we affirm the judgment as modified above.

---

**16.** We have also sustained Household's fourth point of error regarding Allied's authority to act as it did pursuant to its agency agreement with Household. Since we found that Household ratified Allied's conduct, however, Allied's authority becomes irrelevant to the disposition of this case.