# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 5, 2003 Session

## HOWARD LEVY AND SUZANNE LEVY v. JAMES C.D. AND RHONDA FRANKS, LINDSEY BUTLER AND TENNESSEE VALLEY HOMES, INC.

**Appeal from the Chancery Court for Williamson County**
**No. I-25613     R. E. Lee Davies, Chancellor**

---

**No. M2002-02730-COA-R3-CV - Filed July 9, 2004**

---

This case involves a dispute between neighbors.  The plaintiffs owned a one-acre parcel of property in a rural setting almost completely surrounded by a sixteen-acre parcel of property owned by the defendants.  The defendant larger landowners began building structures and storing equipment in an escalating commercial use of their property.  The plaintiff small landowners complained to county officials that the defendants' use of their property constituted a zoning violation.  The ensuing dispute between the two landowners was marked by the defendants engaging in threatening and intimidating behavior and the plaintiffs repeatedly complaining to authorities and incessantly documenting and videotaping the defendants' activities.  Finally, the plaintiffs sued the defendants for, among other things, malicious harassment, outrageous conduct, civil conspiracy, and malicious prosecution.  The trial court found in favor of the plaintiffs on the malicious prosecution claim but declined to award punitive damages.  The trial court dismissed the remaining claims.  The plaintiffs appeal.  We affirm the dismissal of the plaintiffs' claims of malicious harassment and civil conspiracy.  We reverse the dismissal of the plaintiffs' claim for outrageous conduct, finding that the defendants' behavior rose to the level of outrageous conduct, and remand for an award of damages on this claim.  Finally, we reverse the denial of an award of punitive damages on the plaintiffs' malicious prosecution claim.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Peter H. Curry, Nashville, for the appellants Howard Levy and Suzanne Levy.

James D. Kay, Jr. and Mark S. Levan, Nashville, for the appellees James C.D. and Rhonda Franks.

**OPINION**

This case is about an idyllic relationship between neighbors that ultimately became a donnybrook. The area surrounding Holly Hill Drive in Williamson County, Tennessee, was for many years owned by Defendants/Appellees James and Rhonda Franks ("the Franks") and many of their relatives. The Franks maintained their home at 1205 Holly Hill Drive, on a seventeen-acre tract of land, with many family members residing nearby. The Franks family operated a general contracting business, doing commercial and residential construction.

In approximately 1983, the home at 1203 Holly Hill Drive, a one-acre parcel of the original seventeen-acre tract, was sold out of the Franks family to a family by the name of Newman. In 1987, the home at 1203 Holly Hill Drive was purchased by Plaintiffs/Appellants Howard and Suzanne Levy ("the Levys"). The area was quiet, pastoral and mostly rural. The Levys' one-acre property was almost completely surrounded by the Franks' property. The Levys accessed their property by an easement over a driveway that they shared with the Franks, and the water and gas lines to the Levys' home ran under the Franks' property. The Levys' home overlooked a pond that sat on the Franks' property.

For ten years, the families lived in harmony. The children played together, the Levys were invited to the Franks' parties and cookouts, and the Levys were given open access to the Franks' pond and recreational equipment. Each family considered the other to be friends.

In 1994, the Franks built a barn-like structure on their property behind their home. In 1995, the Franks began adding business offices to the barn. In 1997, the Franks built a second barn-like structure on their property, and Mr. Franks began storing equipment for his contracting business there as well.

The Levys became concerned that the Franks' increased operation of their construction and contracting business from their home would have a negative impact on the Levys' enjoyment of their property. Consequently, Mr. Levy anonymously contacted the County Codes Department, inquiring as to whether the structures on the Franks' property and the construction activities were in violation of the residential zoning restrictions of their property. As a result, the Codes Department sent the Franks a letter informing them that they would have to remove one of the barn-like structures on their property, because it had been built in the flood plain.

The Franks learned that Mr. Levy was the source of the report to the County Codes Department. Mr. Franks and his brother met with Mr. Levy on May 27, 1998 to discuss the property uses. The discussion at this meeting remains the subject of some dispute. According to Mr. Levy, in the meeting, Mr. Franks threatened to put pigs in the pond which the Levys' home overlooked, to paint his barn structure orange and place it directly behind the Levys' house, and to cut off the Levys' access to their water line. Mr. Levy maintained that during this meeting Mr. Franks said that he planned to continue operating the family construction business from their property, and Mr. Levy could move if he did not like it. Mr. Franks, on the other hand, said that in the meeting he simply

expressed disappointment with Mr. Levy's conduct, noting that the Franks had always been good neighbors who did not do things such as putting pigs in the pond or painting the barn orange. Mr. Franks also said that he told Mr. Levy about plans to build Mr. Franks' mother a home in a field behind the Levys' property.

In any event, two days following the meeting, Mr. Levy contacted Greg Langeliers ("Mr. Langeliers"), the Planning Coordinator for Williamson County. Mr. Levy complained to Mr. Langeliers about the Franks' use of the property and inquired about the zoning restrictions. Mr. Levy also encouraged Mr. Langeliers to visit the property and issue a stop work order.

The Franks' construction activities on their property continued unabated. Consequently, Mr. Levy visited zoning officials again on June 24, 1998. Mr. Levy was told that Mr. Franks had denied many of the activities Mr. Levy was reporting to the County, and consequently Mr. Langeliers suggested that Mr. Levy obtain "hard" evidence of the Franks' activities on their property.[1] Mr. Levy took this suggestion to heart. That day, Mr. Levy began photographing and videotaping the Franks' property and the common driveway in order to document the activities on the property.

The next day, Mr. Levy received a letter from the Franks, dated March 13, 1998, informing him that the Levy children were no longer to use the Franks' recreational equipment without permission or enter the Franks' property in their absence. Shortly thereafter, as the Levys' eleven-year-old son made his customary trek across the Franks' property to go fishing in the Harpeth River, Mr. Franks stopped him and informed him that he could no longer do so.

On June 26, 1998, the County issued a stop work order on work being done on the Franks' property. When Mr. Langeliers delivered the stop work order to the Franks, Mr. Franks was angry and remarked that "there's fixin' to be a killin' in the holler." Later that day, as Mr. Franks was at the Williamson County community development office obtaining building permits for his property, he repeated this remark. Mr. Langeliers was sufficiently concerned that he told Mr. Levy about Mr. Franks' remark, and both Mr. Levy and Mr. Langeliers filed police reports based on Mr. Franks' statements.

On June 27 and 28, 1998, the days following delivery of the stop work order, Mr. Franks had a dirt road made along the property line between the Franks' and the Levys' property and erected a silt fence[2] between the road and the property line. Mr. Franks also bulldozed six to eight trees into the pond situated on his land but directly in front of the Levys' home. Many of these bulldozed trees would stay in the pond some six months. On July 3, one of the Franks' sons drove a lawn mower on the dirt path, blowing dust and dirt onto the Levys' house. Mr. Levy relentlessly videotaped and photographed these activities, and indeed much of the other activities that occurred over subsequent

---

[1] Mr. Langeliers indicated that he told Mr. Levy this in June 1998, although the exact date is unclear.

[2] From the exhibits, the "silt fence" appears to be a screen of black plastic attached to wooden stakes, typically used to control erosion at a construction work site.

months on the Franks' property, including the comings and goings of employees and relatives. Mr. Levy also remained in contact with county officials. Later, on the day of the lawn mower incident, as Mr. and Mrs. Levy were outside getting ready to drive away from their house, Mr. Franks and a number of his employees stood at the end of their common driveway shouting taunts at the Levys, ridiculing their religious beliefs and calling Mr. Levy a "yellow belly."

On July 1, 1998, the Levys received a letter from the Franklin Water Department regarding the water line that they shared with the Franks. The letter informed the Levys that they would need to obtain their own tap so that water service for the two residences could be separated. On July 6, the Levys received a letter from the Franks' attorney warning the Levys that their access to the shared water line was going to be cut in conformity with the letter from the Franklin Water Department. The letter from the Franks' attorney told the Levys that the Franks were "not inclined" to grant the Levys an easement for a new water line. The letter further warned that the Franks had requested the local gas company to remove a gas line crossing their property and providing service to the Levys' home because the Levys had not obtained an easement for the line. Finally, the letter warned the Levys that if the Levy children ventured onto the Franks' property, it would be considered a trespass.

On July 6, 1998, Mr. Franks submitted a site plan to the Williamson County Planning Commission seeking approval to use his property for a residential business and also seeking retroactive approval for the building of his barn structure in the flood plain. The Franks' proposal was placed on the agenda of the Planning Commission meeting set on August 13, 1998.

On July 24, 1998, Mr. and Mrs. Franks came to the Levys' home, apparently along with two men, Lindsey Butler ("Mr. Butler") and Brandon Dyer, who were relatives and employees of the Franks' construction company.[3] The Franks confronted Mr. Levy at the front door of his home. Unbeknownst to the Franks, Mrs. Levy secretly videotaped the exchange. Although Mr. Levy was quiet, Mr. Franks' demeanor was angry and belligerent, as he told Mr. Levy:

> "I'm goin' on the thirteenth to the board about this planning and you better not be there that's all I got to say"

> "I can tie this thing for three years in Chancery Court, and cost your children's college tuition and everything you want to spend."

> "If you come up and protest anything against me and you're gonna see what's gonna happen"

> "So keep on, I don't know who will murder you, but I'm tellin' ya you're gonna have problems, you don't understand the consequences"

> "Cause I'm, I'm tellin' you man, you don't realize what's gettin' ready to

---

[3] The parties dispute whether Brandon Dyer was present.

happen about all of this. You go and report me now and that's fine. I'm telling you man, videotapin's goin' to get you in trouble."

"Because . . . there ain't a jail in this country that I don't – no matter what jail I go to there's gonna be a problem when you video me one more time."

"So I mean let's, let's get it. You need to move, bottom line. You need to move. You're in the wrong place, and you need to move."

Mrs. Franks added remarks that were profane and derisive. The Franks left the Levy home, the matter unresolved. Later in the day, the Franks placed a large backhoe at the end of the common driveway, blocking a portion of it.

The tension between the two families continued to escalate. The next day, at approximately 7:45 a.m., Mrs. Levy was in her yard tending to her garden. Mr. Franks drove his truck on his property near the Levys' property, and got out of his truck with a gun. He fired two shots on his property, across the pond which the Levys' home overlooked, and then backed his truck away. Alarmed and afraid, Mrs. Levy ran into their house. The Levys called law enforcement officials and filed a report.

Meanwhile, Mr. Franks continued operating the construction business from his home, and Mr. Levy continued videotaping the Franks' activities and keeping county officials such as Mr. Langeliers apprised. In preparation for the August 13 Planning Commission meeting, Mr. Levy obtained signatures from neighbors on a petition opposing the Franks' requests. Mr. Levy also contacted the EPA concerning the Franks' use of their property.

Other, more minor incidents continued to occur. Mr. Levy contended that once the Franks shone their car headlights into the Levys' bedroom window for approximately ten minutes or so at 5:30 a.m., and that the Franks' son once rode a motorized bike by their bedroom at 6:30 a.m. In apparent retaliation for the Levys' constant videotaping of the Franks' activities, the Franks used binoculars to observe the Levys' activities on the deck of their home, and Mr. Franks walked along the property line looking into the Levys' bedroom window.

On July 28, 1998, the Levys filed the instant lawsuit against the Franks. In their complaint, they alleged the Franks had violated Williamson County zoning codes by using their property for business purposes and by erecting the barns without building permits. The Levys asserted that the Franks had responded to the Levys' inquiries about these activities to the County Codes Department by "embark[ing] upon a concerted and illegal effort to harass, coerce, and intimidate [the Levys]." These acts included blocking the Levys' access to the common driveway with fenceposts, threatening to terminate gas and water service without legal basis, warning Mr. Levy not to appear at the August 13 hearing, and threatening to kill Mr. Levy if he continued to videotape activities on the Franks' property. The Levys requested declaratory judgment concerning the common driveway, the gas and water lines, and the business use of and the barns sitting on the Franks' property. They also sought

temporary and permanent injunctive relief, enjoining the Franks from terminating the Levys' gas and water service, from entering the Levys' property, and from obstructing the Levys' use of the common driveway.

Shortly thereafter, without any participation or knowledge of the Levys, the County reached an agreement with the Franks on their proposed site plan and request for approval of the location of the barn. In exchange for the County's agreement to lift the stop work order, the Franks were required to relocate the barn and cease any commercial activity on their property. Consequently, the Franks withdrew their zoning requests from the August 13 Planning Commission meeting.

Pursuant to their agreement with the County, on August 13, 1998, the Franks filed an application for a zoning certificate permitting them to move the barn to the field behind the Levys' home. The Franks also sought a permit to install an in-ground swimming pool, apparently also in the vicinity of the field behind the Levys' home. Both of the Franks' requests were granted on the premise that the field was in the Franks' backyard, and thus was a permissible location for the barn and the pool within the zoning regulations. The Levys appealed both permits with the county board of zoning appeals, on the basis that the planned location of both the barn and the swimming pool in fact were in the Franks' front yard.[4]

During the ensuing time period, despite their agreement with the County, the Franks apparently continued operating their general contracting business from their home, with construction vehicles such as bulldozers and dump trucks. Mr. Levy continued his dogged videotaping of the Franks' activities, and periodically gave the videotapes to county officials. In November 1998, the Assistant Williamson County Attorney sent a letter to the Franks informing them that activities such as storing materials and equipment for a construction business would be a violation of Williamson County zoning ordinances and the agreement the Franks had reached with the County the previous August. Periodically, during this time, Mr. Franks would take actions to underscore the property line between the two families' properties, such as painting a line at the end of the driveway on the property line, and driving stakes at the end of the driveway at the property line.[5] Additionally, the Franks would place a stack of boards with nails and a pile of dirt on the border.

---

[4] The board of zoning appeals affirmed the granting of the permit concerning the location of the barn, with the modification that the barn be considered agricultural and thus exempt from the zoning codes. The board likewise approved the location of the swimming pool, granting the Franks a zoning variance. This was eventually appealed to this Court. *See Levy v. Board of Zoning Appeals*, No. M1999-00126-COA-R3-CV, 2001 WL 1141351, at *2 (Tenn. Ct. App. Sept. 27, 2001). Ultimately, the case was dismissed because the City of Franklin annexed the Franks' property.

[5] Some of these actions were pointedly done in the presence of the Levys' children.

In February 1999, the parties engaged in a court-ordered mediation, to no avail. Evidently, the mediation only resulted in increased rancor. Shortly after the mediation, as Mr. Levy was outside on his deck at night under lights, grilling steaks, Mrs. Franks shouted a fusillade of profanities and insults at him.[6]

On April 23, 1999, an incident occurred with Mr. Butler, one of the employees and relatives of the Franks who had accompanied the Franks in the July 24, 1998 confrontation on the Levys' porch. Mr. Butler is Mrs. Franks' cousin. In the April 23, 1999 incident, Mr. Butler drove a dump truck, owned by the Franks' construction company, up the common driveway and parked near the Levys' home with a long pipe in the bed of the truck. Mr. Butler got out of the truck and angrily threw rocks and dirt at their house, damaging it. Mr. Butler then got back in the truck, pulled back down the driveway, and stopped at the end. Sitting in his truck, he shouted a barrage of taunts and vile obscenities at the Levys and their children, including "get your f---- pussy a-- over here you God d--- child molestin ------ f-----" and "get your f----- d--- out of your daughter's God d--- a--." Most of this incident was, of course, videotaped by the Levys. After Mr. Butler left, the Levys called law enforcement officials, who came to their home. When Mr. Butler returned, he was arrested and charged with criminal trespass. When Mr. Levy went to the jail to swear out a warrant against Mr. Butler, he was met by the Franks, Mrs. Franks' mother, and at least one of the Franks' employees, Robert Haemmerlein, in the jail parking lot. As Mr. Levy went to and from his car, they blocked his path and shouted another onslaught of epithets.[7]

That same day, in obvious retaliation, Mr. Franks filed criminal trespass charges against Mr. Levy, alleging that on several occasions during April 1999, Mr. Levy had trespassed on the Franks' property. As a result, the Monday after Mr. Butler's arrest,[8] a Sheriff's deputy came to the Levys' home and arrested Mr. Levy for criminal trespass. The district attorney decided to *nolle prosequi* the charges against both Mr. Butler and Mr. Levy.

Not long after that, in May 1999, the Levys installed a twenty-four hour surveillance system on their property, which included a camera aimed at the common driveway. This was closely

---

[6] Mrs. Franks later acknowledged the occurrence, explaining that she "had to release some tension." She maintained, however, that she did not know Mr. Levy was there at the time.

[7] Mr. Haemmerlein corroborated that the Franks' group was verbally abusive to Mr. Levy, who was "stoic" in response.

[8] Another example of Mr. Butler's sophomoric and brutish behavior occurred at a restaurant to which Mr. Levy had taken his young teenage daughter. Mr. Levy and his daughter were waiting in the restaurant foyer to be seated, next to a large glass window, and Mr. Butler left the restaurant. After he had left, Mr. Butler reappeared suddenly, screaming and smashing his face against the plate glass window very close to Mr. Levy and his daughter. This, of course, shook up Mr. Levy's daughter and caused her to cry.

followed by the Franks' erection of a thirteen foot-high[9] stockade-style wooden privacy fence along the property line shared with the Levys' property. This resulted in the Levys' home being surrounded on most of three sides by the fencing, with the exception of the back property line, on which the fence's frame was constructed, and the Levys' personal driveway leading off the common driveway.[10] The fence stood for over fifteen months[11] until it was dismantled in September 2000, shortly before (unsuccessful) court-ordered mediation. The day after the stockade fence was taken down, the Franks brought in truckloads of dirt and deposited the dirt along the property line, between the Franks' pond and the Levys' home.[12]

Following the Franks' erection of the wooden fencing, on September 9, 1999, the Levys filed an amended complaint in which they added Mr. Butler and the Franks' construction company, Tennessee Valley Homes, Inc., as defendants. They also added claims against all of the defendants for civil conspiracy, malicious harassment, and outrageous conduct, and against Mr. Franks for malicious prosecution.[13]

The trial in this case was held from August 12 through August 16, 2002. Mr. and Mrs. Levy testified, as well as Mr. and Mrs. Franks, and other witnesses such as Greg Langeliers, the Wilson County Coordinator, and Robert Haemmerlein, the contractor who worked for the Franks and was present at the jail parking lot when Mr. Levy swore out the warrant against Mr. Butler. Because of the exhaustive videotaping and photographs by the Levys, with the exception of the earliest occurrences, most of the events in question were in large part undisputed. The interpretation and reasons for the episodes were, however, sharply disputed.

In their testimony, the Levys recounted the events at length, as well as their emotional reaction. Mr. Levy's protracted testimony was punctuated by numerous videotapes, photographs, and diary entries. During the course of Mr. Levy's testimony, he described making anonymous telephone calls to county authorities to inquire about the zoning restrictions on the Franks' property and to complain about the construction of the second barn/warehouse and the use of the property for the Franks' construction business. The trial judge asked him:

---

[9] Mr. Franks said that the fence was eleven feet eight inches high. A photograph in the record, however, shows Mrs. Levy standing in front of the stockade fence, dwarfed by its height. The black plastic construction silt fence remained at the bottom of the fence, facing the Levys' yard.

[10] The reason why the fence frame was erected on the back property line but the stockade fencing was not is not apparent in the record.

[11] A neighbor, Marilyn Lucas, testified that the stockade fence was "oppressive."

[12] By the time of trial, the dirt had been used to build up the sides of the pond.

[13] The Levys' claims against Mr. Butler and Tennessee Valley Homes, Inc. were later settled.

THE COURT: Mr. Levy, . . . did you consider going over and discussing it with Mr. Franks before you kind of launched the first salvo?

MR. LEVY: Yes, I did.

* * *

THE COURT: So did you think about going over and taking him a beer and saying, you know, we're friends, but I've got to bring this up because it's bothering me? Did you think about doing that?

MR. LEVY: I did, your Honor.

THE COURT: But decided not to?

MR. LEVY: That is correct.

THE COURT: Because?

* * *

MR. LEVY: My hope – my hope was that what was going to happen was that the county would deal with the situation, Mr. Franks would never know who anonymously called, maybe they just happened upon his property and they wouldn't even have known there was a call. It would have been dealt with. The problems would have gone away and our friendship would have remained.

In addition to the evidence of the course of events between the parties, the Levys offered evidence of their mental injury resulting from the continuing conflict. Mrs. Levy testified that, as a result of the Franks' conduct, she suffered from depression, crying, hopelessness, anxiety, helplessness, low self-esteem, agitation, sleep deprivation, weight loss, and stomach discomfort. Mr. and Mrs. Levy both sought counseling from a psychologist, Dr. Allen Godwin ("Dr. Godwin"). Mrs. Levy visited Dr. Goodwin on twelve occasions, and Mr. Levy made thirty-one visits. Dr. Godwin testified that Mrs. Levy suffered from depression with symptoms of anxiety, while Mr. Levy showed symptoms of anxiety, all of which stemmed from their conflict with the Franks. Dr. Godwin testified that he referred Mrs. Levy to Dr. Samuel Sells, a psychiatrist, who diagnosed her with clinical depression and wrote a prescription for medication for her depression and sleep problems. Dr. Sells concurred with Dr. Godwin on the cause of Mrs. Levy's mental distress, testifying that her diagnosis stemmed from the conflict with the Franks, though he also indicated unspecified problems with her children. The Levys submitted into evidence bills for psychiatric treatment and counseling totaling $7,058.06 for Mr. Levy and $5,123.66 for Mrs. Levy.

Marilyn Lucas ("Ms. Lucas"), one of the Levys' neighbors, and Paul Thorson ("Mr. Thorson"), a church friend of the Levys, testified about changes in the Levys' appearance and demeanor as a result of the conflict with the Franks. Ms. Lucas recalled noticeable weight loss in both Mr. and Mrs. Levy. She also noted that Mr. Levy became "anxious, agitated and uncomfortable" while Mrs. Levy "appeared more withdrawn, more quiet than usual, and less communicative." Mr. Thorson noted that Mr. Levy seemed "quite sad," becoming "increasingly withdrawn, and very serious about everything," while Mrs. Levy lost weight, "seemed as one who had been intimidated a lot . . . was reluctant to make eye contact, . . . would cry easily, and had really very little joy."

The Franks did not put on any evidence disputing the extent of the Levys' mental and emotional distress, but offered evidence that there were other stressors present. The Franks offered testimony from Vaughn Sinclair, an associate professor of nursing at Vanderbilt University who also did private-practice counseling. Mrs. Levy sought counseling with Ms. Sinclair because of her feelings of helplessness in dealing with the conflict with the Franks. Ms. Sinclair testified that, during counseling, Mrs. Levy discussed numerous stressors independent of the problems with the Franks, including marital discord, a loss of family income, Mr. Levy's depression, a life-threatening incident while on vacation, and concerns about her children.

After testimony from the Levys and their witnesses, Mr. Franks testified. After learning that Mr. Levy was the source of the anonymous telephone calls to the county, Mr. Franks said, he initiated the first meeting. Mr. Franks did not recall making any threats to Mr. Levy in that meeting. He said that he merely remarked to Mr. Levy that he could be living near someone who would put pigs in the pond or would paint the barn orange. Mr. Franks denied telling Mr. Levy that he would cut off his water line. Mr. Franks said that, at the time, his business had only three or four employees and he had only a "satellite" office at his home, to accommodate his family.

Mr. Franks testified that, upon the advice of his attorney, he sent the Levys the letter telling them that their children could not go on the Franks' property in their absence or use their recreational equipment without permission. He said that he was "apologetic" about telling the Levys' son that he could not cross their property to go fishing at the river, and said tearfully that he had been "very nice" to their son in doing so. The silt fence was put at the property line for "erosion control." The tall wooden stockade-style fence was erected to prevent "friction" between the two families, and Mr. Franks said that he was "very apologetic that fence ever went up." Bulldozing the trees into the pond was part of a "long-range plan" to improve the pond, and they were left in the water for months "until they dried up where we could burn them." Mr. Franks did not recall an incident in which he and several workmen insulted Mr. Levy's religious beliefs. In the videotaped incident on the Levys' porch on June 24, 1998, Mr. Franks explained that he had "expressed [his] concern that this is not how Christians act."

On the date that the County official, Mr. Langeliers, served the stop-work order on the Franks, Mr. Franks explained, his house was being remodeled and the whole family was living in tight quarters in two rooms during the remodeling process. Mr. Franks acknowledged making the

statement "there's fixin' to be a killin' in the holler," but said that he was not mad at the time, that it was said "in jest" and "we all smiled and we were laughing about it."[14] At the same time, he said, the Levys' constant videotaping was "making everybody boil." He protested that the "killin' in the holler" remark "never was a threat." In response to a series of suggestive questions from his attorney on direct, Mr. Franks allowed that the remark may have been an expression of his concern that a subcontractor would become violent over the videotaping, because "many" of the subcontractors carried guns. As for Mr. Langeliers' contention that the "killin' in the holler" remark was repeated by Mr. Franks again in the county office, Mr. Franks said that he could not remember whether he made the remark or whether Mr. Langeliers himself said it. At any rate, Mr. Franks asserted, when the remark was made, "we were laughing, we were talking. There was never any intent there." He protested, "Seems like everything I say or any action that's done is just totally misconstrued and I just don't know what to do."

Mr. Franks' attorney also questioned him on the videotaped confrontation on June 24, 1998, at the Levys' front door. Mr. Franks explained that he was frustrated and "venting" and mad and trying to "protect my child." He had little explanation for the threats that Mr. Levy "better not show up" at the Planning Commission meeting, that he would tie the matter up in Chancery Court for three years, and that they would spend their children's college funds. Mr. Franks said that he was "very apologetic" and had "no excuses." When asked about his remark that it didn't matter what jail he went to, Mr. Franks said that he was "scared for my family." Mr. Franks' attorney did not ask him to explain his statement, "So keep on, I don't know who will murder you, but I'm tellin' ya you're gonna have problems. . . ."

Mr. Franks acknowledged the gunshots across his pond the next day at 7:45 a.m. while Mrs. Levy was tending to her garden. He explained:

> My mother had called me that morning at 5:30, and I talked to my
> sister, Brenda, and her husband at 5:30, 6:00. Doug had already shot
> at a skunk and told me he was probably going — you know, I'd
> probably see it when I was leaving. And I had my .22 pistol with me,
> I believe is what it was. And I shot across the pond at the skunk.

Mr. Franks later clarified that the skunk was supposedly "rabid" and his relatives told him to be "on the lookout" for it.[15] As to the headlights shining into the Levys' bedroom window at 5:30 a.m., Mr. Franks said, "I suppose my headlights were facing their house," but it was not done to harass the Levys.

---

[14] In his testimony about hearing Mr. Franks' remark, Mr. Langeliers testified that he did not recall any laughter at the time; rather, he recalled the situation as being "tense" and that Mr. Franks was mad.

[15] Mrs. Franks testified: "I remember that very well, the skunk incident. Jimmy's mother — Brenda called us and said, 'A skunk is headed your way.' "

Mr. Franks disclaimed knowledge of Mr. Butler's actions which resulted in Mr. Butler's arrest for criminal trespass, and said he did not approve of the words he used. After he learned that Mr. Butler had been arrested, Mr. Franks said, he went to the jail to see about Mr. Butler and to see about having Mr. Levy arrested for coming onto his property with a video camera. Mr. Franks commented that he had tried "many times" to have Mr. Levy "removed" from his property. He swore out the warrant against Mr. Levy immediately after Mr. Butler was arrested because "it was a convenient time to do it." He did not remember any obscenities yelled at Mr. Levy as he went to and from the jail. Mr. Franks described Mr. Levy as "obsessed" with videotaping. He likened him to "paparazzi" and termed it an invasion of his family's privacy.

At the close of the Levys' proof, the Franks moved for dismissal of the civil conspiracy claim, the outrageous conduct claim, and the malicious harassment claim. The trial court dismissed the claim for malicious harassment, holding that the statute on which the claim was based, Tennessee Code Annotated section 4-21-701, requires proof that the defendant intended to harass based on the plaintiff's race, color, religion, ancestry, or national origin. The trial court found no such intent in the present case: "What motivated Mr. Franks is what he perceived the Levys did to him, and he was responding in a fashion that I don't care for, but I do not believe that it falls under, or can fall under, malicious harassment as set out in 4-21-701." Therefore, the malicious harassment claim was dismissed. The civil conspiracy and outrageous conduct claims were not dismissed at this point.

At the conclusion of the trial, the trial court addressed the Levys' remaining claims. First, the trial court found in favor of the Franks on the claim for outrageous conduct. The trial judge noted at the outset that liability is found only where the conduct is extreme and outrageous; if this standard is not met, it is not sufficient that the defendant "has acted with an intent which is tort[i]ous or even criminal or that he has intended to inflict emotional distress." The trial court then found:

> Most of the things that I went over prior, during the Motion to Dismiss, I feel Mr. Franks did in retaliation to the conduct of Mr. Levy, . . . but I cannot find that they go to the point of being beyond the bounds of decency, to be regarded as atrocious and utterly intolerable. They were certainly aggravating. There was certainly some malice.

The trial judge then went on to tell Mr. Levy:

> But I would also note, Mr. Levy, that your conduct added fuel to this fire. It's one thing to try to put together some evidence for some type of public hearing that's coming up, but it's another to just, day in and day out, wear this thing out . . . .
>
> . . . .

Mr. Levy, again, I don't think you did anything wrong in informing the proper authorities on Mr. Franks, but . . . the approach here was just the wrong approach.

I would hope maybe that you would learn from this case and maybe your children might learn from this case that if they do have a problem with their neighbor . . . , maybe the best course of action is to talk to them about it first. It may not work, . . . but the other approach is just bound to make people mad.

Consequently, the trial court dismissed the Levys' claim for outrageous conduct.

The trial court likewise found in favor of the Franks on the Levys' claim for civil conspiracy. First, the trial court noted that the goal of the alleged conspiracy, preventing the Levys from appearing at the August 13 Civil Commission hearing, was never attained because the Franks withdrew their request, and the Levys were not prevented from attending any other meeting because of the Franks' conduct. Further, the trial court did not find the concerted action necessary to support a finding of civil conspiracy: "What really appeared to me that was going on, . . . I have two people [, Mr. and Mrs. Franks,] who are out-of-control mad, but certainly don't seem to be acting in concert with one another." Therefore, the Levys' claim for civil conspiracy was dismissed.

On the Levys' claim for malicious prosecution, the trial court found in favor of the Levys: "I've heard the proof in this case, and I find it [the arrest warrant against Mr. Levy] was instituted without probable cause. I find it was brought with malice, because of the arrest of Mr. Lindsey Butler, and it was, in fact, terminated in favor of Mr. Levy." The trial court awarded Mr. Levy $5,000 in damages for mental anguish plus $1,050 in attorney's fees. It declined, however, to award punitive damages.

Finally, the trial court enjoined either party from going on the other's property,[16] made provisions for a driveway easement, a gas line and driveway maintenance, and enjoined the re-erection of a thirteen-foot stockade fence on the basis that it would constitute a nuisance. The trial court entered its final order on October 3, 2002, consistent with its oral ruling. From that order, the Levys now appeal.

The Levys argue that the trial court erred in dismissing their claim of malicious harassment, contending that a claim of malicious harassment should be recognized for the Franks' attempt to prevent them from exercising their constitutional right to free speech. Second, the Levys argue that the trial court erred in dismissing their claim of civil conspiracy, maintaining that the record clearly showed concerted activity among the Franks and their relatives and employees, and that it is irrelevant whether their goals were attained. The Levys assert further that the trial court erred in dismissing their claim of outrageous conduct, insisting that the Franks' conduct was atrocious and

---

[16] The trial judge wisely permanently enjoined Mr. Butler from going onto the Levys' property.

utterly intolerable. Finally, the Levys contend that the trial court erred in declining to award punitive damages on their claim of malicious prosecution.

This case was tried without a jury. Therefore, unless the preponderance of the evidence is otherwise, we review the trial court's factual findings *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). The weight, faith, and credit granted to a witness's testimony lies first with the trial court, which has the opportunity to observe the witness's manner and demeanor while testifying. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). Because the trial court is in a far better position than this Court to determine those issues, the credibility accorded at trial will be given great weight on appeal. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court's conclusions of law are reviewed *de novo*, with no presumption of correctness. *Campbell*, 919 S.W.2d at 35.

The Levys first argue that the trial court erred in dismissing their malicious harassment claim based on the malicious harassment statute, section 4-21-701 of the Tennessee Code Annotated. The Levys alleged that the statute affords them a remedy because the Franks intentionally attempted to prevent them from appearing at the planning commission meeting, thus intimidating them from exercising their constitutional right to free speech. The trial court dismissed the malicious harassment claim at the conclusion of the Levys' proof, because it found that the Franks had no intent to harass the Levys based on the Levys' race, color, religion, ancestry or national origin. Rather, the trial court concluded, the Franks' actions were motivated by what the Franks perceived that the Levys did to them. The Levys contend that section 4-21-701 of the Tennessee Code Annotated should not be interpreted to require harassment based on the victim's race, color, religion, ancestry or national origin.

The malicious harassment statute, Tennessee Code Annotated, section 4-21-701, provides: "(a) There is hereby created a civil cause of action for malicious harassment. (b) A person may be liable to the victim of malicious harassment for both special and general damages, including, but not limited to, damages for emotional distress, reasonable attorney's fees and costs, and punitive damages." Tenn. Code Ann. § 4-21-701 (1998). The elements of the tort created by this statute were outlined by the Tennessee Supreme Court in *Washington v. Robertson County*:

> [A] claim of malicious harassment requires not only that a person acted maliciously, i.e., ill-will, hatred or spite, but also that a person unlawfully intimidated another from the free exercise or enjoyment of a constitutional right by injuring or threatening to injure or coercing another person or by damaging, destroying or defacing any real or personal property of another person.

*Washington v. Robertson County*, 29 S.W.3d 466, 473 (Tenn. 2000). *Washington* made it clear that, in order to establish a claim under section 4-21-701, the victim must show that the perpetrator intentionally intimidated the victim from the free exercise of a constitutional right.

*Washington*, however, did not directly address whether malicious harassment under section 4-21-701 must be motivated by the victim's race, color, religion, ancestry or national origin, as was held by the trial court below. That issue was addressed by this Court in *Surber v. Cannon*, No. M1998-00928-COA-R3-CV, 2001 WL 120735 (Tenn. Ct. App. Feb. 14, 2001). In *Surber*, the minor plaintiff was subjected on two occasions to the defendant's lewd and exhibitionist behavior while walking her dog in front of her home. *Id.* at *1-2. Surber contended that the defendant's malicious behavior deprived her of her constitutional right to privacy, and was directed at her because of her gender. *Id.* at *5. After reviewing the short but convoluted legislative history of section 4-21-701,[17] as well as the Tennessee Supreme Court's analysis of the statute in *Washington v. Robertson County*, the *Surber* court denied Surber's claim of malicious harassment for two alternative reasons. As the first reason, the *Surber* court held: "There is simply no evidence in this record that [defendant]'s actions were motivated by any intent to intimidate Ms. Surber . . . . [or] to prevent her from exercising any civil right or as retribution for the exercise of any such right by her." *Id.* at *6. As an alternative basis for its holding, the *Surber* court stated:

> In addition, there is no evidence that [the defendant]'s actions were directed toward Ms. Surber because of her "race, color, ancestry, religion or national origin," and she does not claim they were. Rather, she asserts a gender-based motivation . . . and argues that Tenn.Code Ann. § 4-21-701 should be read to include gender based harassment. Based on *Washington*, we cannot broaden the legislature's definition of malicious harassment beyond the elements of civil rights intimidation, as set out in Tenn.Code Ann. § 39-17-309. Having considered the plain language of § 309, we fail to see that its reach extends to gender based discrimination.

*Id.* at *6. Thus, the *Surber* court concluded that, to be actionable under section 4-21-701, the harassment must be based on the victim's "race, color, ancestry, religion or national origin." *Id.*

The Levys argue in this appeal that the alternative reason for the *Surber* court's holding is mere dicta and should be rejected. Even if it is considered dicta, we find it persuasive. The *Surber* court's holding is consistent with cases decided prior to *Washington*, in which section 4-21-701 has consistently been interpreted as requiring a protected class under 39-17-309. *See Young v. State Farm Mut. Auto. Ins. Co.*, 868 F. Supp. 937, 942-43 (W.D. Tenn. 1994) (holding that plaintiff failed to state a claim for malicious harassment under section 4-21-701 because age is not enumerated in either 39-17-309 or its predecessor, 39-17-313); *Parr v. Middle Tenn. State Univ.*, No. M1999-01442-COA-R3-CV, 1999 WL 1086451, at *4 (Tenn. Ct. App. Dec. 3, 1999) (permission to appeal denied May 15, 2000) (holding that plaintiff failed to state a claim under 4-21-

---

[17] The legislative history of Tennessee Code Annotated § 4-21-701 is reviewed at length in *Washington*, 29 S.W.3d at 471-73, and *Surber*, 2001 WL 120735, at *3-5, and we need not review it in detail again in this Opinion. Suffice it to say, the *Washington* court and the *Surber* court concluded that the elements of a malicious harassment claim under section 4-21-701 are drawn with reference to the criminal statute, Tennessee Code Annotated § 39-17-309 (2003).

701 because she alleged harassment on the basis of a disability, which is not enumerated in either 39-17-313 or 39-17-309); *Vafaie v. Owens*, No. 92C-1642, 1996 WL 502133, at *7 (Tenn. Ct. App. Sept. 6, 1996) (holding that plaintiff did not state a claim for malicious harassment because she did not allege the defendant intended to prevent her from exercising a constitutional right and because she did not allege the defendant was motivated by any of the enumerated factors of 39-17-309). In addition, the Tennessee Supreme Court declined to review *Surber*, which followed the *Washington* decision. Considering all of these circumstances, we agree with the reasoning of the trial court and affirm its dismissal of the claim for malicious harassment.

The Levys next argue that the trial court erred in dismissing their claim of civil conspiracy. They contend that, as a matter of law, it is irrelevant whether the Franks succeeded in achieving the goals of the alleged conspiracy, namely preventing the Levys from exercising their right to be heard before the Planning Commission and persuading the Levys to abandon their home. The Levys also maintain that the evidence preponderates against the trial court's finding that there was no concerted activity among Mr. and Mrs. Franks and their relatives and employees to achieve these goals.

A civil conspiracy is "a 'combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.'" *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001) (quoting *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001)). In a criminal conspiracy, one is guilty of conspiracy from the moment he enters into agreement with at least one other person to accomplish an unlawful or criminal act. *See State v. Long*, 800 S.W.2d 507, 509 (Tenn. Crim. App. 1990). In contrast, there is no liability under a theory of civil conspiracy unless there is underlying wrongful conduct. *Greene v. Brown & Williamson Tobacco Corp.*, 72 F. Supp. 2d 882, 887 (W.D. Tenn. 1999) (quoting *Tenn. Pub. Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932)). This has long been the law:

> "It is a general rule that a conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a right of action. The damage done is the gist of the action, not the conspiracy. . . . [T]he simple act of conspiracy does not furnish a substantive ground of action."

*Tenn. Pub. Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932) (quoting *Robertson v. Parks*, 24 A. 411, 413 (Md. 1892)). Therefore, if the claim underlying the allegation of civil conspiracy fails, the conspiracy claim must also fail. *Greene*, 72 F. Supp. 2d at 887 (citing *Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994); *Felts v. Paradise*, 158 S.W.2d 727, 729 (Tenn. 1942)).

In their amended complaint, the Levys allege that the Franks conspired to violate the Levys' constitutional rights in violation of the malicious harassment statute, section 4-21-701. As discussed above, the trial court's dismissal of the malicious harassment claim is affirmed. Since the Levys' underlying malicious harassment claim fails, their civil conspiracy claim must also fail because " '[i]t cannot be that a conspiracy to do a thing is actionable where the thing itself would not be.' "

*Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994) (quoting *Felts v. Paradise*, 158 S.W.2d 727, 729 (Tenn. 1942)).

In addition, the trial court dismissed the claim of civil conspiracy based on its finding that there was no concerted action. This finding is based in part on the trial court's assessment of the credibility of the witnesses. Determinations of credibility by the trial court are, of course, accorded great weight on appeal. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). Under these circumstances, we cannot conclude that the evidence preponderates against the trial court's finding of no concerted action. Consequently, we affirm the trial court's dismissal of the Levys' claim for civil conspiracy.

Next, the Levys contest the trial court's dismissal of their claim of outrageous conduct. They argue that the Franks' conduct, in light of the nature and the quantity of their actions and the trial court's finding of malice, exceeded the bounds of decency and could only be regarded as atrocious and utterly intolerable in a civilized community.

To prevail on a claim for outrageous conduct, a plaintiff must prove three elements: " '(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury.' " *Steinbrunner v. Turner Funeral Home, Inc.*, E2001-00014-COA-R3-CV, 2002 WL 14088, at *4 (Tenn. Ct. App. Jan. 2, 2002) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997)). Outrageous conduct does not include " 'mere insults, indignities, threats, annoyances, petty oppression or other trivialities.' " *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 539 (Tenn. Ct. App. 2003) (quoting *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)). The standard for determining whether the conduct is "outrageous" was referred to by the trial judge in his ruling and is set forth in *Steinbrunner*:

> " 'The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' ' "

*Steinbrunner*, 2002 WL 14088, at *4 (quoting *Alexander v. Inman*, 825 S.W.2d 102, 104 (Tenn. Ct. App. 1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965))).

In some situations, a single act can be sufficiently egregious to satisfy the standard for outrageous conduct. ***See, e.g.***, ***Johnson v. Woman's Hosp.***, 527 S.W.2d 133, 140 (Tenn. Ct. App. 1975) (holding that a jury could find outrageous conduct when hospital employee showed distraught mother a jar of formaldehyde containing her dead infant's body). In other cases, the cumulative effect of the defendant's acts rises to the level of outrageous conduct. In ***Household Credit Serv., Inc. v. Driscol***, 989 S.W.2d 72 (Tex. Ct. App. 1998), the defendant was a collection agency hired to get the plaintiff to pay her overdue VISA credit card bill. ***Id.*** at 78. The defendant's employees called the plaintiff incessantly at home and at work, including a false bomb threat to her workplace and a call in which the employee told the plaintiff there was "a contract out on you." ***Id.*** at 78-79. In analyzing the plaintiff's claim of outrageous conduct, the ***Household*** court stated:

> [T]he entire course of conduct in this case gives rise to the intentional infliction of emotional distress claims. With the possible exceptions of the bomb and death threats, no single action of Household or Allied alone, including name-calling, foul language, any single ill-timed phone call, multiple calls at home on any single day, repeated calls to [the plaintiff]'s place of employment after she asked them to stop, or even the threat to make [the plaintiff]'s life miserable, rises to the level of intentional infliction of emotional distress. But all of these acts taken together amount to such harassment of a woman who simply could not pay her VISA bill as to be more than petty oppression. Together, they rise to the level of behavior beyond all possible bounds of decency, and utterly intolerable in a civilized community.

***Id.*** at 81-82. ***See also Kisesky v. Carpenters' Trust for So. Cal.***, 144 Cal. App. 3d 222, 229-30, 192 Cal. Rptr. 492, 496 (Cal. Ct. App. 1983).

In this case, when Mr. Levy had the temerity to oppose the Franks' use of their property for business purposes, and engaged in annoying videotaping to rebut Mr. Franks' denial of such activities, Mr. Franks responded with death threats. From telling Mr. Langeliers, twice, that "there's fixin' to be a killin' in the holler," to the videotaped confrontation at the Levys' home in which he told Mr. Levy, "So keep on, I don't know who will murder you, but I'm tellin' you you're gonna have problems. . . . don't matter what jail I go to. . . .," to firing gunshots near Mrs. Levy the next morning, Mr. Franks plainly wanted Mr. Levy to know that the safety of his family was at risk. By their entire course of conduct,[18] the Franks sought to quell any opposition to the Franks' use of their

---

[18] The conduct of Mr. Butler would have to be considered at least as a backdrop for the Franks' actions. The trial court correctly found that there was no evidence that the Franks were aware that Mr. Butler intended to come onto the Levys' property or damage their home or shout vile obscenities at the family. Mr. Franks testified at trial that he did not condone Mr. Butler's actions. However, at the time, the Franks clearly supported Mr. Butler, going so far as to shout epithets at Mr. Levy for having Mr. Butler arrested and having Mr. Levy arrested in retaliation. Consequently, even though the Levys' claims against Mr. Butler had been settled as of the trial date, at the time, Mr. Butler's actions certainly contributed to the Levys' fear for their safety.

property as a staging ground for their construction business, by intimidating the Levys into either submitting meekly or selling their home.

At trial, Mr. Franks sought to portray himself as the victim of a series of gross misunderstandings, punctuated by tearful apologies where the evidence did not permit such prevarication. Undoubtedly some percentage of the incidents at issue were the result of over-sensitivity by the Levys, but this was the inevitable result of the Franks' intimidation, designed to make the Levys jittery and wary. As to the remainder of the incidents, some of Mr. Franks' explanations were cooly implausible, such as his protestation that his statement "there's fixin' to be a killin' in the holler," repeated twice, was made "in jest," or, in the alternative, out of concern that a subcontractor might turn violent. Other explanations were preposterous, such as the story that the gunshots the morning after the videotaped confrontation were the result of an early morning telephone call from a relative that a rabid skunk was headed his way, dutifully corroborated by Mrs. Franks. Such guile reinforces the trial court's conclusion that the Franks' actions were done with malice.

The trial court then went on to consider the Levys' actions and to view the situation in total context. This was, of course, appropriate. Surprisingly, however, instead of telling Mr. Franks that his death threats and other actions were egregious overreaction to Mr. Levy's conduct, the trial court admonished Mr. Levy at length for anonymously reporting the Franks' zoning violations to government officials, and ultimately concluded that the Franks' conduct was "in retaliation to the conduct of Mr. Levy." Such reasoning is troubling, essentially blaming the victim. Undoubtedly, Mr. Levy would have been wiser not to report the Franks anonymously in the futile hope that his identity would not come to light. No matter. It in no way justified the Franks' menacing, bellicose response. And while Mr. Levy clearly engaged in overzealous videotaping, this is perhaps understandable overreaction to the situation in which he found himself. Mr. Franks obviously had an unwavering resolve that he would utilize his property as he wished, without regard to zoning ordinances or other restrictions, and did not hesitate to simply deny violative conduct. When this was unsuccessful, his goal became to tyrannize and oppress, and ultimately to oust, the Levy family. Rarely is there a perfect response to a bully, and the law does not require that the victim be either blameless or passive.

The standard for outrageous conduct is high, indeed. Taken in its entirety, however, we must conclude that the standard here is met, that Mr. Franks' behavior must be regarded as " 'atrocious and utterly intolerable in a civilized community.' " *Alexander v. Inman*, 825 S.W.2d 102, 104 (Tenn. Ct. App. 1991) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Since Mrs. Franks' behavior does not rise to the level of outrageous conduct, the trial court's dismissal of this claim against her is affirmed.

Because the trial court concluded that the defendants acted with malice, and this Court has concluded that Mr. Franks' actions meet the standard for outrageous conduct, we must now consider the third element of the tort, that is, the requirement that the conduct result in serious mental injury. *Steinbrunner v. Turner Funeral Home, Inc.*, No. E2001-00014-COA-R3-CV, 2002 WL 14088,

at *4 (Tenn. Ct. App. Jan. 2, 2002).  In proving serious mental injury, a plaintiff must show more than the " 'transient and trivial emotional distress [that] is a part of the price of living among people.' " *Miller v. Willbanks*, 8 S.W.3d 607, 615 n.4 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).  Rather, serious mental injury is that in which " 'the distress is so severe that no reasonable [person] could be expected to endure it.' " *Id.* (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).  In *Miller v. Willbanks*, the Tennessee Supreme Court recognized that a plaintiff may establish such emotional harm by several means, such as through the plaintiff's own testimony, lay witness testimony of the plaintiff's acquaintances, physical manifestations of emotional distress, evidence of nightmares, insomnia and depression, proof of psychiatric treatment, or evidence of the mental distress' intensity and duration.  *Id.* at 615.

Because the trial court concluded that the Franks' conduct did not rise to the level of outrageous conduct, it did not reach the element of serious mental injury.  Consequently, we must consider the evidence in the record on this issue.  The Levys offered substantial, undisputed evidence to support their claim of severe mental injury.  Mrs. Levy testified that, as a result of Mr. Franks' conduct, she suffered from loss of weight, depression, anxiety, hopelessness, low self-esteem, crying, stomach problems, agitations, and sleeplessness.  She and Mr. Levy both sought counseling from Dr. Godwin, who diagnosed Mrs. Levy with depression and Mr. Levy with anxiety resulting from the conflict.  Dr. Sells prescribed Mrs. Levy medication to cope with her symptoms.  Acquaintances testified that, during the course of the conflict, both Mr. and Mrs. Levy's appearance and demeanor had become withdrawn and sad.

The Franks offered testimony that the Levys' emotional landscape was not pristine, that they had other more typical stresses, such as marital discord and problems with children.  However, the evidence that the Levys suffered "serious mental injury" as a result of Mr. Franks' conduct is essentially unrebutted.  Consequently, we must conclude that the Levys have proven the elements of their claim for outrageous conduct.  Therefore, we must reverse the trial court's dismissal of the Levys' claim for outrageous conduct against Mr. Franks, and remand the cause to the trial court for an award of damages on this claim.

Finally, the Levys argue that the trial court erred by declining to award punitive damages for their malicious prosecution claim.  The trial court found that Mr. Levy's arrest was done with malice, in retaliation for Mr. Butler's arrest, and awarded Mr. Levy $5,000 in compensatory damages, but declined to award punitive damages.  Malicious prosecution requires a showing that the defendant acted with malice or for a reason other than bringing the plaintiff to justice in instigating criminal procedures.  *Cannon v. Peninsula Hosp.*, No. E2003-00200-COA-R3-CV, 2003 WL 22335087, at *1 (Tenn. Ct. App. Sept. 25, 2003).  Because the trial court found malice, the Levys contend that the trial court should have granted punitive damages.

Punitive damages in the context of malicious prosecution are analyzed as any other claim for punitive damages, under the principles outlined in *Hodges v. S.C. Toof and Co.  See Wright Med. Tech., Inc. v. Grisoni*, No. W2001-01302-COA-R7-CV, 2001 WL 1683754, at *22 (Tenn. Ct. App. Dec. 18, 2001).  Under *Hodges*, punitive damages are appropriate only where there has been a

showing of "intentional, fraudulent, malicious, or reckless conduct *by clear and convincing evidence*." **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896, 901 (Tenn. 1992) (emphasis added). In the present case, the trial court found malice, but did not state whether Mr. Franks' malice with respect to Mr. Levy's arrest had been established by clear and convincing evidence. After reviewing the record as a whole, however, we must conclude that the element of malice was established by clear and convincing evidence. Under these circumstances, we must reverse the trial court's denial of punitive damages on the Levys' malicious prosecution claim, and remand the cause for an award of punitive damages.

Therefore, the decision of the trial court is affirmed except for its holding on the claim of outrageous conduct as to Mr. Franks and the denial of punitive damages on the claim of malicious prosecution. The trial court's denial of the Levys' claim for outrageous conduct as pertaining to Mr. Franks is reversed, and the cause remanded for an award of damages on this claim. The trial court's denial of punitive damages for Mr. Franks' malicious prosecution of Mr. Levy is likewise reversed, and the cause remanded for an award of punitive damages on this claim.

The decision of the trial court is affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this Opinion. Costs are divided equally between Plaintiffs/Appellants Howard Levy and Suzanne Levy and Defendants/Appellees James C.D. and Rhonda Franks and their sureties, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE